**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Billy H. HOWTON and Larry T. Lee, Defendants-Appellants.**

No. 81–2331.

United States Court of Appeals, Fifth Circuit.

Sept. 17, 1982.

---

James A. Moore, Richard West, Houston, Tex., for Lee.

Scott W. Hudson, William A. Bratton, II, Frank S. Wright, Dallas, Tex., for Howton.

Samuel Longoria, Asst. U. S. Atty., Houston, Tex., for plaintiff-appellee.

Before CLARK, Chief Judge, GEE, and GARZA, Circuit Judges.

GEE, Circuit Judge:

These appeals had their genesis in an interstate confidence game whereby numerous well-known institutional investors were bilked out of millions of dollars. Since none of the points advanced for reversal turns on any feature of the scheme itself, only a general description of it is needed as background for our discussion. Additional facts of peculiar relevance to a particular point will be stated in our discussion of it.

### The Scam Proper

In 1977 appellant Howton, together with one Reynolds, formed a corporation that ostensibly dealt in large packages of student loans guaranteed by the United States. Appellant Lee was a securities salesman in Memphis who, for a commission on all such sales there, handled transactions and touted the so-called "repos" as good investments. These were agreements by which appel-

lants' corporation sold a loan package to a customer, agreeing to repurchase it after a stated time—usually 30 to 90 days—with interest. Failure to repurchase or extend the time for doing so was supposed to result in delivery of the actual student loans themselves to the customer.

And so the victims lined up, wiring their millions of dollars to the appellants and receiving "repo" agreements in return. These were not honored, and no one ever received any student loans; indeed, it is dubious that appellants ever had any. In time came the crash; indictments for mail, wire, and interstate travel fraud; and convictions on various counts. Reynolds has made his peace and is serving his time. Appellants draw before us various points that we consider one by one.

*Joint Representation: Conflict of Interest?*

Howton claims that the joint representation of himself and the other two defendants by one attorney denied his fifth and sixth amendment rights to conflict-free counsel. It is his contention that this joint representation permitted only one theory of defense, that no crime had been committed, and forced the abandonment of another, that one had been but Lee alone—who misrepresented the goods to investors—was responsible.

We have long held that, like the right to counsel of any kind, the right to conflict-free counsel can be waived. For this waiver to be effective, the record must show that the trial court ascertained that it was knowingly, intelligently, and voluntarily done:

> In accordance with the foregoing principles, we instruct the district court to follow a procedure akin to that promulgated in F.R.Crim.P. 11 whereby the defendant's voluntariness and knowledge of the consequences of a guilty plea will be manifest on the face of the record. *Cf. Boykin v. Alabama*, 395 U.S. 238, 244, 89 S.Ct. 1709 [1712] 23 L.Ed.2d 274, 280 (1969); *McCarthy v. United States*, 394

U.S. 459, 466, 89 S.Ct. 1166 [1170] 22 L.Ed.2d 418, 425 (1969); *United States v. Vera*, 514 F.2d 102, 104 (5th Cir. 1975); *United States v. Davis*, 493 F.2d 502 (5th Cir. 1974). As in Rule 11 procedures, the district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections. *Cf. United States v. Foster*, 469 F.2d 1 (1st Cir. 1972). It is, of course, vital that the waiver be established by "clear, unequivocal, and unambiguous language." *National Equipment Rental v. Szukent*, 375 U.S. 311, 84 S.Ct. 411, 11 L.Ed.2d 354, 367–8 (1964). Mere assent in response to a series of questions from the bench may in some circumstances constitute an adequate waiver, but the court should nonetheless endeavor to have each defendant personally articulate in detail his intent to forego this significant constitutional protection. Recordation of the waiver colloquy between defendant and judge will also serve the government's interest by assisting in shielding any potential conviction from collateral attack, either on Sixth Amendment grounds or on a Fifth or Fourteenth Amendment "fundamental fairness" basis.

*United States v. Garcia*, 517 F.2d 272, 278 (5th Cir. 1975).

Bearing the rule of *Garcia* in mind, we have carefully examined the lengthy collo-

quy carried on between Howton—the only defendant raising this contention—counsel, and the court. We set it out in the margin.[1]

THE COURT: Mr. Moore, will you have your clients step up here? I would like to interrogate them as to any possible conflicts.

MR. MOORE: If Your Honor please, this is Mr. Bill Howton, Towner Reynolds, Larry Lee. I would like to ask each of you collectively a question. The purpose of this, Judge O'Conor is concerned about potential conflict of interest, as is always a problem in multi-defendant situations. You understand that you are each charged jointly in some parts of the indictment and some are separately, particularly Mr. Lee. The question is do each of you understand and have been advised that I represent each of you individually? Do you understand that, Mr. Lee?

THE DEFENDANT LEE: Yes.

MR. MOORE: Mr. Reynolds?

THE DEFENDANT REYNOLDS: Yes.

MR. MOORE: Mr. Howton?

THE DEFENDANT HOWTON: Yes.

MR. MOORE: You understand that a defendant in a criminal case is entitled to a lawyer of his choosing, assistance of counsel, and you are entitled to employ one. And if you do not have funds, the court will employ one. Have I continuously represented each of you in all matters in this lawsuit up to and including today?

THE DEFENDANT HOWTON: Yes.

THE DEFENDANT REYNOLDS: Yes.

THE DEFENDANT LEE: Yes.

MR. MOORE: Have I counseled to you that I do represent each of the other two defendants?

THE DEFENDANT HOWTON: Yes.

THE DEFENDANT REYNOLDS: Yes.

THE DEFENDANT LEE: Yes.

MR. MOORE: Have you counseled with other lawyers and in particular Mr. Tondre and Mr. McFarland about the possibility of a conflict of interest?

THE DEFENDANT HOWTON: Yes.

THE DEFENDANT REYNOLDS: Yes.

THE DEFENDANT LEE: Yes.

MR. MOORE: Do they represent you in certain civil matters?

MR. HOWTON: Yes.

. . . .

MR. MOORE: Mr. Howton, are you satisfied with the representation that there is no conflict of interest between you and Mr. Lee and Mr. Reynolds in the trial of this lawsuit?

THE DEFENDANT HOWTON: Yes, I am.

MR. MOORE: Will you and do you knowingly and intelligently waive any potential conflict of interest should one arise in the representation of this case?

THE DEFENDANT HOWTON: Yes, I do.

MR. MOORE: Have I told each of you that if one does arise, I will immediately advise His Honor Judge O'Conor and each of you individually and at that time we will address the problems if one arises?

THE DEFENDANT HOWTON: Yes, we have.

THE COURT: Do you have anything further?

MR. MOORE: No, Your Honor. Does the Court have some problem?

THE COURT: Yes. I would like you to finish. I didn't mean to interrupt you.

MR. MOORE: That's all I had, Your Honor, in that connection.

THE COURT: You gentlemen understand that the problem of conflict may not be apparent, but there are three of you together here, and whether or not you are equally culpable in this case may not become apparent until a jury would rule in this case. In other words, hypothetically if one of you were to be acquitted and two of you found not guilty or two found not guilty—I mean two of you convicted and one found innocent, the two that were found guilty would feel perhaps a conflict and the lawyer represented the one found not guilty more than he did me. Or if one were found guilty and two were found to be innocent, hypothetically, then there might be an allegation by the one found guilty that what happened was that the defense attorney laid down for me; he didn't do the job for me; and I wasn't fairly represented. I thought that I would clear this up at this time because the fact that these are serious charges here. There are 27 counts to this indictment. I don't know that some of those counts might not merge at the time of trial. But they are substantially serious accusations that are made. I don't know if they are factually correct. That will be determined at the time of trial.

As you know, the government has the burden of proving your guilt beyond a reasonable doubt. This case has been going on for sometime; you have had the same lawyer. If you feel now that there is any conflict in any of your positions or that you feel he is representing one of you more than he is representing the others or if you feel that you all stand on equal footing here, and that he can ably do the work, I will allow him to continue to represent you.

I will again ask you if you feel there is any conflict in him representing each of you. Do you feel that there is any conflict, Mr. Howton?

THE DEFENDANT HOWTON: No, I don't. I have great confidence in Mr. Moore's ability, and I would like for him to proceed on the case.

. . . .

THE COURT: . . . . And in that regard, again, should you be found guilty, the role of sentencing is upon me, and certainly then I will have to judge again, looking to see if there was equal culpability. Somebody might receive a severe sentence; another a

■ The effectiveness of such waivers must be decided on the basis of the particular facts and circumstances of each case, including the background, experience, and conduct of the accused. *Id.* at 277 & n.5. Here the record reflects that at the time of trial Howton was 51 years of age, a graduate of Rice University, and a businessman of wide and varied experience. His testimony indicates intelligence, articulateness, and self-possession. Considering these things, along with the substance of the colloquy set out in the margin, we find ourselves unable to overturn the trial court's determination that Howton knowingly, intelligently, and voluntarily waived conflict-free counsel. In Rule 11 proceedings, to which *Garcia, supra,* likens such waivers, we review similar determinations under the clearly erroneous rubric. *United States v. Dayton,* 604 F.2d 931 (5th Cir. 1979) (en banc). We see no reason to apply a different standard here, especially in view of the Supreme Court's recent decision in *Pullman-Standard v. Swint,* —— U.S. ——, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982).

The ruling below was not clearly erroneous. Since it was not and Howton was correctly determined to have waived any conflict or potential conflict of interest, we need not pass on the other contention of the United States under this head, that no actual conflict existed.

*Withholding of the Report*

■ In a much slighter point, Howton complains of the refusal of the trial court to order production of a report that a witness admitted he had reviewed several weeks before testifying. The witness, a peace officer, had participated in preparing the report, that of an investigation into the death of one Arbab (Bob) Kahn, an associate of Howton. Citing Rule 612, Fed.R.Evid., Howton called for production of the entire report. The court refused this, based upon objection that the report contained sensitive matter. It did, however, grant Howton's request that the court review the report *in camera,* doing so and concluding that it was not germane to the matter covered with the witness on direct.[2] It therefore did not require disclosure of the report. Despite retention of the report by the court in case later testimony might implicate it, Howton never sought to subpoena it for use in his own presentation.

There is no error here. To the contrary, it appears that the court faithfully and correctly followed the provisions of Rule 612.[3]

The above disposes of Howton's points of error, and we now turn to those advanced by Lee.

*Count 27: Obstruction of Justice*

Lee was indicted and convicted of obstruction of justice grounded in false testi-

---

lighter sentence or probation. One might not receive probation and the other might, depending on the case. This is all hypothetical, of course, because the jury might acquit you. So that at that time again the question of representation might—at that time you might feel you were not adequately represented, and the fellow that got probation. That would come up.

In light of all that I have told you, do you feel that there is any conflict?

THE DEFENDANT REYNOLDS: No, Your Honor, I don't.

THE DEFENDANT HOWTON: I do not.

THE DEFENDANT LEE: No, sir.

**2.** Our independent review of the report confirms the court's determination.

**3.** Which provides, in pertinent part:

[I]f a witness uses a writing to refresh his memory for the purpose of testifying, either—

(1) while testifying, or

(2) before testifying, if the court in its discretion determines it is necessary in the interests of justice,

an adverse party is entitled to have the writing produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce in evidence those portions which relate to the testimony of the witness. If it is claimed that the writing contains matters not related to the subject matter of the testimony the court shall examine the writing in camera, excise any portions not so related and order delivery of the remainder to the party entitled thereto. Any portion withheld over objections shall be preserved and made available to the appellate court in the event of an appeal.

mony that he gave the grand jury concerning commissions paid Memphis stock salesmen by him, commissions that he falsely characterized as loans. In pertinent part, the indictment charged:

1. The Federal Grand Jury for the Southern District of Texas, during May and June of 1980, was conducting an investigation into possible violations of the mail fraud and wire fraud statutes, Title 18, United States Code, Sections 1341 and 1343, concerning FFG and its president and vice-president, BILLY H. HOWTON and VINING TOWNER REYNOLDS, JR.

2. It was material to the aforesaid Grand Jury investigation to determine whether certain payments made to securities salesmen in Memphis, Tennessee, by LARRY T. LEE were fees or commissions related to repurchase agreements involving GSLs and FFG. It was further material to said Grand Jury investigation to determine whether two checks in the amount of one thousand two hundred fifty ($1,250) dollars each paid by LARRY T. LEE to Danny Stallings, containing the notation "fee" and "final on GSL transaction" were related to the repurchase agreements involving GSL and FFG.

3. On June 17, 1980, the defendant LARRY T. LEE appeared before the Grand Jury and corruptly endeavored to obstruct the due administration of justice by testifying falsely concerning the purpose of the two checks in the amount of one thousand two hundred fifty ($1,250) dollars each paid by LARRY T. LEE to Danny Stallings. That is, during his Grand Jury appearance on June 17, 1980, the defendant LARRY T. LEE responded to the questions listed below and testified falsely under oath as follows:

Q: And there is—Looking through the checking account, back there in that same period of time, I think the summer of '79, there is a couple of $1,250 checks to Daniel Stallings. What are these for?

A: I don't remember. I loaned Danny Stallings money, too. I loaned a lot of people money last year. I'd like to have it back right now.

Q: Stallings never paid you back?

A: Not all of it; some of it.

Q: How much did he pay you back?

A: I don't know. I'd have to look at my records.

Q: That was—Those are two loans?

A: To the best—to the best of my knowledge, both of those were loans.

Q: You can't think of anything else that possibly could have been?

A: No.

Q: Except loans?

A: No.

Lee makes two complaints connected with his conviction on this count.

■ The first, sufficiently meritless as properly to be characterized as frivolous, is that by instructing the jury that the above testimony was "material" the court partially directed a verdict of guilty. To the contrary, it is settled that the issue of materiality in such and similar prosecutions is "a question of law for determination by the court." *United States v. Baker*, 626 F.2d 512, 514 n.4 (5th Cir. 1980).

■ The second, of somewhat more substance, is that Lee's testimony mischaracterizing the commissions, though perhaps false, did not have the effect of closing off avenues of inquiry entirely to the grand jury. Assuming, without deciding, that "merely false" testimony might not furnish a proper basis for a charge of obstruction of justice, we conclude that Lee's testimony was not "merely false." *See United States v. Griffin*, 589 F.2d 200 (5th Cir. 1979). As the United States correctly points out, had the grand jury believed Lee's false testimony that the payments in question represented loans rather than sales commissions, the Memphis dimension of the scam might never have been uncovered, and Lee might never have been prosecuted. Thus it represented a bold effort to abort that phase of the investigation entirely. This aspect of it

therefore removes it from the realm of "mere" perjury and places it squarely in the *Griffin* line as obstruction of justice.

### Prejudicial Evidence

■ Lee's final complaint is of the admission of evidence related to the murder of Arbab (Bob) Kahn, an associate of the conspirators with whom funds derived from the scam were placed for investment in precious metals. Kahn, subpoenaed by the grand jury to testify regarding the scheme and the funds he had received from it, was found shot to death in a remote area near Houston a few days before he was to appear. This evidence was received in connection with another count (26) of the indictment, one of which Lee was subsequently acquitted, charging that he obstructed justice by falsely testifying to the grand jury that he did not know Kahn and believed he was not in Houston on the weekend of Kahn's murder.

It is Lee's theory that this evidence was both irrelevant to any issue in the case and so highly prejudicial that it tainted his convictions on the other two counts, that just discussed and one of mail fraud. A major difficulty with accepting this contention, however, arises from the circumstance that Lee is able to point out no objection made at trial referable to any such theory. He could have objected to the receipt of evidence of Kahn's death on Rule 403 grounds,[4] moved for severance or separate trial of the count, or perhaps objected to the jury charge. Since he did none of these things, our review may notice only plain error—one "so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings and result in a miscarriage of justice." *United States v. Graves*, 669 F.2d 964, 971 (5th Cir. 1982).

No such error is present here. In the first place, the evidence was not, as Lee asserts, irrelevant to any issue in the case. The grand jury was concerned with the murder of its subpoenaed witness Kahn and, though it was not strong, there was evidence indicating a connection between Lee and that witness. Lee, however, in grand jury testimony denied knowing Kahn and denied being in Houston at the time of his death. The grand jury, therefore, indicted Lee for obstruction of justice on the basis of these denials. We cannot say that this indictment was groundless, though in the event it failed of proof; and the evidence that Kahn was killed and when was relevant to it. In the second, the evidence connecting Lee to Kahn was, as we have said, very weak—sufficiently so that the court granted a motion for acquittal on count 26. We cannot presume that, though the government failed in its attempt to connect Lee to Kahn, the jury acted so irrationally as even so to convict Lee of two unrelated crimes because it knew that someone with whom the prosecution failed to connect Lee significantly was killed. Especially is this so when the evidence properly supporting these convictions was ample, sufficiently so that it is not drawn in question on this appeal.

### Conclusion

Since neither Howton's nor Lee's claims on appeal present reversible error, their convictions on all counts are

AFFIRMED.

---

**4.** Rule 403, Fed.R.Evid., permits the exclusion of even relevant evidence if, among other things, its probative value is substantially outweighed by the danger of unfair prejudice.