UNITED STATES of America, Plaintiff–Appellee,

v.

Patrick C. RICHERSON, Defendant–Appellant.

No. 86–3818.

United States Court of Appeals, Fifth Circuit.

Dec. 2, 1987.

Robert Glass, Glass & Reed, New Orleans, La., for defendant-appellant.

Lawrence Benson, Dennis Reich, Asst. U.S. Attys., John P. Volz, U.S. Atty., Jan Maselli, Peter G. Strasser, Asst. U.S. Attys., New Orleans, La., for plaintiff-appellee.

Before GOLDBERG, JOHNSON, and WILLIAMS, Circuit Judges:

GOLDBERG, Circuit Judge:

Found guilty of conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 and two counts of attempted willful tax evasion in violation of 26 U.S.C. § 7201, Patrick C. Richerson appeals, asserting as grounds for reversal: (1) that, because the Government charged one conspiracy and proved, if any, three, there was a prejudicial variance between indictment and proof on the conspiracy count; (2) that the mail fraud instruction incorrectly stated the law as subsequently set forth in *McNally v. United States*, — U.S. —, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987); and (3) that the instructions to the jury on the tax issue were prejudicially erroneous. Finding no merit in any of these contentions, we affirm the convictions.

A federal grand jury returned a ten count indictment against Richerson. Count One charged a conspiracy to commit mail fraud in violation of 18 U.S.C. § 371.[1] Counts Two through Eight charged substantive mail fraud violations of 18 U.S.C. § 1341.[2] Counts Nine and Ten charged attempted willful tax evasion in violation of 26 U.S.C. § 7201[3] for the tax years 1980 and 1981.

At the close of the Government's case the district court entered a judgment of acquittal on two of the seven substantive mail fraud counts—Counts Three and Four. The jury acquitted Richerson on all of the remaining substantive mail fraud counts—Counts Two, and Five through Eight. The jury, however, convicted Richerson on the conspiracy count and both of the tax evasion counts—Counts One, Nine, and Ten.[4]

## I. FACTS

Viewed in the light most favorable to the government, *see Glasser v. United States*, 315 U.S. 60, 62 S.Ct. 457, 86 L.Ed. 680 (1942), the facts are as follows. Pool Offshore Company ("Pool Offshore"), an oil drilling contractor, operated twenty to thirty offshore rigs in the Gulf of Mexico during the oil drilling boom of the late 1970s and early 1980s. These rigs were each worth over one million dollars and rented for $1,000.00 per hour. Vendors were anxious to lock in large volumes of business supplying parts and services to the drilling contractors, like Pool Offshore. A group of Pool Offshore employees capitalized on the vendors' desire to lock in Pool Offshore's business by steering that business to those vendors willing to pay the largest bribes. These vendors then recouped at least some of the bribes through false invoices submitted to Pool Offshore. As a

---

**1.** 18 U.S.C. § 371 provides:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

**2.** 18 U.S.C. § 1341 provides:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises ... places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall

be fined not more than $1,000 or imprisoned not more than five years, or both.

**3.** 26 U.S.C. § 7201 provides:

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

**4.** The district court sentenced Richerson to three years in prison on the conspiracy count and required that he make restitution to Pool Offshore Company in the amount of $100,000.00. In addition, on the two tax evasion counts, the district court sentenced Richerson to concurrent five year probation terms to begin after his release from prison. The court also required that Richerson make restitution to the Internal Revenue Service in the total amount of $30,040.30 and pay the costs of prosecution.

result, various Pool Offshore employees fraudulently obtained cash and personal items at Pool Offshore's expense.

### A. Cast of Characters

Like any play of several acts, the facts that we consider involve a large cast of characters. We introduce the leading characters at the outset and the remainder as they appear.

Pool Offshore hired the defendant, Patrick C. Richerson, to serve as Drilling Superintendent in 1975. After several interim promotions, Richerson became Pool Offshore's vice-president of operations on January 1, 1979. Richerson resigned on August 31, 1981. From September 1981 through July 1983 Richerson operated his own drilling company. He also served as executive vice-president of Baytron, Inc. from September 1981 through December 1982. Richerson rejoined Pool Offshore as executive vice president from August 9, 1983 until September 4, 1984.

In 1979, Richerson hired Henry Billiot, Sr. as Pool Offshore's electronics expert. Billiot, the only qualified electrical man at Pool Offshore, had authority to make all of Pool Offshore's electronic equipment purchases. Although Billiot reported to Richerson, no one at Pool Offshore had enough technical electronic expertise to question Billiot's purchasing decisions. While employed at Pool Offshore, Richerson and Billiot became close personal friends.

Billiot's long time friend Ebdon Rodriguez owned Ace Electric Motor Services, Inc. ("Ace"), a Pool Offshore supplier. Rodriguez testified that Ace paid approximately $300,000.00 in kickbacks to Billiot during Billiot's tenure at Pool. Rodriguez received approximately $100,000.00 through his participation in the Pool Offshore kickback scheme. Rodriguez also paid kickbacks to Billiot at another company before Pool Offshore employed Billiot.

### B. Fraudulent Transactions—One Play Act or Three?

In Richerson's indictment and at his trial the Government characterized the Pool Offshore fraud as one conspiracy. On appeal, Richerson contends that the evidence actually proved that he was involved in three separate conspiracies, if any. Richerson argues that the first of these three separate conspiracies was limited to obtaining personal assets through Henry Billiot, Sr., Henry Billiot, Jr., Ebdon Rodriguez, Ace Electric, Universal Electric, and Primary Electric. Richerson contends that the second, separate conspiracy was limited to the loan he received from Louisiana Offshore Air-conditioning & Electrical Services, Inc. ("LOAES"), through Leonard Cable. Richerson asserts that a third, separate conspiracy was limited to the stock that he acquired in Baytron, Inc., through James Edwards.

1. *Personal Assets Obtained Through Billiot, Rodriguez, Ace, Universal, and Primary.* According to Richerson the first conspiracy was limited to obtaining kickbacks of personal assets through Billiot, Ebdon Rodriguez, Ace, Universal Electric Company, Billiot's son, Henry Billiot, Jr., and Primary Electric Service and Supply Company.

At trial, Billiot testified that Richerson asked him for various things and that he obtained these things through electrical vendors. The vendors then recovered their costs by submitting false or inflated invoices to Pool Offshore. For example, Billiot had a vendor deliver an ice maker to Richerson and submit an inflated invoice to Pool to cover the cost. At trial Richerson contended that Billiot was simply an extravagant, eccentric, wealthy genius who, liking him, gave him expensive gifts. The jury, by convicting Richerson on three counts, apparently rejected this argument.

Billiot testified that Richerson asked him to get a Jeep that Richerson had seen while visiting Ace. To get this Jeep,[5] Billiot paid an Ace employee approximately $15,000.00 with a check drawn on Universal Electric

---

5. Billiot testified that Richerson had seen a jet boat with the Jeep and asked for it also. Billiot purchased the boat with the Jeep. Billiot, however, later admitted that the jet boat was actually for him and that Richerson merely stored it for a time.

Company ("Universal").[6] Ace repaid Universal for this $15,000.00. Ace then submitted false invoices, with false charges to a particular drilling rig, to Pool Offshore to recover this $15,000.00. Billiot arranged for approval of the false invoices by the drilling superintendent of the rig charged. Billiot approved the false Ace invoices himself. Finally Billiot had Richerson approve the false Ace invoices.[7] Pool Offshore then paid the false Ace invoices.

Billiot arranged the purchase of a new Chevrolet Corvette that Richerson asked for. Billiot told his son, Henry Billiot, Jr., to submit a false Primary Electric Service and Supply Company ("Primary Electric")[8] invoice to Pool Offshore for $19,110.00 to cover the cost of the Corvette. Billiot testified that Richerson approved this invoice after being told that it would cover the Corvette. Pool Offshore then paid this Primary Electric invoice and Primary Electric wrote a check to Universal for $18,459.72. The next day Billiot signed a Universal check payable to a Chevrolet dealer for $18,459.72. With this Universal check, Billiot, Jr. purchased the Corvette, signing the registration papers and bill of sale in Richerson's name.[9]

Richerson, Billiot, Rodriguez and Billiot, Jr. had two meetings to discuss cover up plans after Pool Offshore and its parent, Enserch Corporation began to investigate Billiot's electrical equipment purchases. At one meeting Rodriguez testified that

Richerson said that he "would give money out of his freezer to pay for Henry for the Corvette that night." At the second meeting Richerson suggested paying someone to stop the investigation.

2. *Loan Obtained Through LOAES and Cable.* Richerson states that the second conspiracy involved Leonard Cable and his company, Louisiana Offshore Air Conditioning & Electrical Services, Inc. ("LOAES"). LOAES sold equipment to Pool Offshore. Between 1979 and 1985 LOAES received from Pool Offshore a total of $2,499,000.00, representing more than 80% of LOAES's gross revenues for the period. Leonard Cable loaned[10] Richerson $10,000.00 in cash. Cable made the "loan" as a favor to Pool Offshore, and as a favor to Richerson himself so that Pool Offshore would continue to buy from LOAES.

Cable attempted to recoup this $10,000.00 through a false invoice submitted to Pool Offshore for "Cat–Eye explosion proof lights" for rig 454. Billiot called Cable and said that he could not justify those lights on that rig. Billiot instructed Cable to void the invoice and to call someone else at Pool Offshore to tell them that the lights "had been returned." Billiot then assisted two of Cable's employees in rebilling the $10,000.00. Cable also acknowledged that some of his employees had given kickbacks totalling approximate-

6. Billiot owned Universal. During Billiot's employment at Pool Offshore, Billiot used Universal to launder kickback checks.

7. Pool Offshore's internal policies limited Billiot's unilateral invoice approval authority to expenditures of $500.00 or less. Both Billiot and Richerson had to approve electrical equipment and services expenditures in excess of $500.00. There was no dollar limit on Richerson's authority to approve expenditures.

8. Henry Billiot, Jr., owned Primary Electric Service and Supply Company.

9. Billiot testified that Richerson told him to go to a store and pick up two fur coats held in Richerson's name. Billiot said that he picked up the coats, paid cash for them and gave the coats to Richerson. Richerson later returned the coats for a cash refund, signing the refund ticket himself.

Billiot and Rodriguez worked together to get two boats that Richerson requested and, later, when one of these boats was stolen, to replace it. Ace billed Pool for each of these boats. Billiot testified that he told Richerson that the boats would be paid for by Pool.

Billiot also testified that Richerson asked him for cash in amounts from $3,000.00 to $5,000.00 on approximately six occasions and that he obtained this cash from Ace and laundered it through Universal. Although Richerson admitted receiving the other things discussed above, Richerson denied receiving this cash.

10. Richerson claimed the $10,000.00 was a loan. Richerson, however, neither signed a note nor repaid the $10,000.00. In addition, there is no evidence of any agreement regarding interest and Richerson specifically requested that Cable supply the money in cash.

ly $40,000.00 to Pool Offshore employees and recouped these kickbacks through false invoices.

3. *The Stock Obtained Through Baytron, Inc.* According to Richerson, the third conspiracy involved Baytron, Inc. and its founder James Edwards. Richerson purchased 350 shares, or 35% of the outstanding stock, of Baytron, Inc. between 1979 and 1981.[11] After Richerson left Pool Offshore on August 31, 1981, Baytron employed Richerson as an executive vice-president. In December 1982 Baytron fired Richerson. Although Pool Offshore had made significant purchases from Baytron for several years, Pool Offshore never bought anything from Baytron after December 1982. Pool Offshore's parent, Enserch Corporation, a publicly held corporation, had a written conflict of interest policy. Enserch's written policy prohibited employee acceptance of gifts, other than nominal gifts, from vendors and required that employees disclose any conflict of interest. Richerson signed several letters acknowledging the policy but repeatedly failed to disclose his Baytron, Inc. stock on conflict of interest disclosure statements.

## II. VARIANCE BETWEEN INDICTMENT AND PROOF

Richerson contends that this court should reverse his conviction on the conspiracy count and remand this case for a new trial because a fatal variance exists between the indictment, which charged a single, multifaceted conspiracy, and the proof at trial, which at best demonstrated the existence of several independent conspiracies. On appeal, Richerson contends that the loan from LOAES resulted from a "factually distinct" conspiracy. Richerson also contends on appeal that because the Government did not allege or prove that Baytron participated in false invoicing or kickbacks the "Baytron conspiracy" was a separate conspiracy.

The Government argues that the evidence proved a single continuing conspiracy consisting of Richerson, subordinate Pool employees, buffer companies and oil field vendors. The Government argues that the goal of this single conspiracy was obtaining personal gain by collecting kickbacks and bribes from oil field vendors.[12]

■ To prove a conspiracy the government must prove beyond a reasonable doubt that (1) a common agreement or conspiracy existed; (2) the accused knew of the conspiracy; and (3) the accused, with knowledge, voluntarily joined the conspiracy. *United States v. Elam*, 678 F.2d 1234, 1245 (5th Cir.1982).

In *Berger v. United States*, 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), the government obtained a single count conspiracy indictment against the defendant and then at trial proved two conspiracies. Both conspiracies involved contemporaneous transactions. The defendant participated in both conspiracies. The *Berger* Court held that the variance between the indictment and proof was not fatal. 295 U.S. at 84, 55 S.Ct. at 631. The Court stated that "[t]he true inquiry ... is not whether there has been a variance in proof, but whether there has been such a variance as to 'affect the substantial rights' of the accused." 295 U.S. at 82, 55 S.Ct. at 630.

■ Richerson must therefore establish that (1) a variance between indictment and proof occurred, and (2) that the variance affected his "substantial rights."[13]

### A. Counting Conspiracies

■ To determine whether there was a variance between indictment and proof we

---

**11.** Richerson's wife worked as a secretary for Baytron while Richerson was employed at Pool Offshore. After Richerson left Pool Offshore on August 31, 1981, he used office space at Baytron.

**12.** The indictment alleged that the object of the conspiracy was to obtain money and property from Pool's vendors and ultimately Pool by defrauding them through false and fraudulent pretenses, and to conceal this scheme to defraud.

**13.** *United States v. Morado*, 454 F.2d 167, 170 (5th Cir.1972) (citing *Kotteakos v. United States*, 328 U.S. 750, 775, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946)).

must "count" the number of conspiracies proved at trial. Counting the number of conspiracies proved is a difficult exercise. *United States v. Morado,* 454 F.2d 167, 170 (5th Cir.), *cert. denied,* 406 U.S. 917, 92 S.Ct. 1767, 32 L.Ed.2d 116 (1972). In counting the number of conspiracies, the principal factors are (1) the existence of a common goal, (2) the nature of the scheme and (3) overlapping of participants in the various dealings. *United States v. Tilton,* 610 F.2d 302, 307 (5th Cir.1980).

■ 1. *The common goal.* Where the evidence demonstrates that all of the alleged co-conspirators directed their efforts towards the accomplishment of a single goal or common purpose, then a single conspiracy exists. *Elam,* 678 F.2d at 1245. "[T]here must be one objective, or set of objectives, or an overall objective to be achieved by multiple actions." *United States v. Perez,* 489 F.2d 51, 62 (5th Cir. 1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974). This court has identified as "common purposes": (1) "the passing of a large quantity of counterfeit bills over a period of time"; [14] (2) a series of staged automobile collisions involving a varying pattern of participants, in different locations, over an extended time period; [15] (3) a plan, over three years in process, with varying participants, to buy cocaine; [16] and (4) in a mail fraud conspiracy case, "mutual enrichment" or "the amassing of money by false representations about the value of Llano ore and its commercial capabilities." [17] Given these broad "common goals" the common objective test may have become a mere matter of semantics. *See United States v. Perez,* 489 F.2d at 62 n. 18. In any event, given this precedent, we cannot say that the Government statement of the common goal is incorrect. The Government states that the common goal driving all members of the single conspiracy in this case was their personal gain through the

fraud of Pool Offshore. The Pool Offshore employees realized personal gains by obtaining money and property through kickbacks, and the vendors realized gains by locking in millions of dollars of business through bribes. The overall plan was for all members to obtain some reward for their participation in the conspiracy.

2. *The nature of the scheme.* Another factor is the inherent nature of the criminal scheme. *Elam,* 678 F.2d at 1246. Courts frequently characterize conspiracies as "wheels" or "chains." As this court has said before, however,

> Finding that they impede rather than facilitate analysis of the "single conspiracy—multiple conspiracy" issue, we eschew utilization of figurative analogies such as "wheels," "rims" and "hubs," which are often used to describe the nature of complex conspiracies. We reiterate Judge Brown's comment in *United States v. Perez,* 489 F.2d 51 (5th Cir. 1973), that "[c]onspiracies are as complex as the versatility of human nature and federal protection against them is not to be measured by spokes, hubs, wheels, rims, chains or any one or all of today's galaxy of mechanical molecular or atomic forms." 489 F.2d at 59, n. 11. The government is not required to attempt to squeeze conspiracy into any particular mold.

*Elam,* 678 F.2d at 1246. In determining the inherent nature of the criminal scheme the *Perez* court said:

> If [an] agreement contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up, then such agreement constitutes a single conspiracy.

*Perez,* 489 F.2d at 62. In *Elam* this court said:

---

14. *United States v. Lloyd,* 425 F.2d 711, 712 (5th Cir.1970).

15. *Perez,* 489 F.2d at 62–63.

16. *United States v. Rodriguez,* 509 F.2d 1342, 1348 (5th Cir.1975).

17. *United States v. Becker,* 569 F.2d 951, 955 & 959 (5th Cir.), *cert. denied,* 439 U.S. 865, 99 S.Ct. 188, 58 L.Ed.2d 174 (1978) (defendants alleged that sales of silver options, refining contracts and a Bahamian loan swindle were separate conspiracies).

Where the activities of one aspect of the scheme are necessary or advantageous to the success of another aspect of the scheme or to the overall success of the venture, where there are several parts inherent in a larger common plan, . . . the existence of a single conspiracy will be inferred.

*Elam,* 678 F.2d at 1246.

The nature of this conspiracy was that each member had a different task and level of involvement. A member's task and level of involvement depended on his position in Pool Offshore, in a participating vendor company, or in a buffer company used to conceal the conspiracy. The success of this conspiracy depended on the continued willingness of each member to perform his function. Without the cooperation of the vendors, Ace, LOAES, and Baytron, the overall scheme would have failed. The success of the scheme depended on the continued willingness of the vendors to pay bribes to obtain Pool's business. Likewise, the success of the scheme depended in large part on the continued cooperation of Primary and Universal Electric in laundering the inflated invoices to Pool Offshore to conceal the kickback scheme. The scheme required that the rig superintendents, Billiot and Richerson approve the inflated invoices. The scheme also required that Billiot and Richerson continue to select vendors on the basis of their willingness to pay bribes through kickbacks, loans, or ownership positions in vendor companies. In addition, Billiot and Richerson provided necessary direction for the scheme.

3. *Overlapping of participants in the various dealings.* The final factor which determines whether a single conspiracy exists is the interrelationships between the participants and various parts of the scheme. "Where the memberships of two criminal endeavors overlap, a single conspiracy may be found." *Elam,* 678 F.2d at

1246. There is no requirement that every member must participate in every transaction to find a single conspiracy.[18] Parties who knowingly participate with core conspirators to achieve a common goal may be members of an overall conspiracy. *Perez,* 489 F.2d at 62.

■ A single conspiracy exists where a "key man" is involved in and directs illegal activities, while various combinations of other participants exert individual efforts toward a common goal. *Elam,* 678 F.2d at 1246. Richerson was that "key man." The members of a conspiracy which functions through a division of labor need not have an awareness of the existence of the other members, or be privy to the details of each aspect of the conspiracy. *Elam,* 678 F.2d at 1246. Thus, to establish a single conspiracy, the Government did not have to show that Cable at LOAES or Edwards at Baytron knew exactly what Billiot was doing with Richerson through Ace, Primary and Universal. All that the Government had to show to establish overlapping participants was that Cable and Edwards were conspiring with Richerson, a core conspirator, to pay bribes for Pool Offshore's business.

The Government argues that the proof at trial showed one overall agreement among the various parties to perform different functions to carry out the objective of the conspiracy and to bring about a continuous result through the continued cooperation of the conspirators. This court has held that similar agreements constituted one conspiracy.[19] As a result it appears that no variance existed between the indictment and the Government's proof at trial.

*B. Prejudice to Substantial Rights*

■ But even if a variance existed between the indictment and proof at trial, the variance would not be reversible error un-

---

**18.** *United States v. Perez,* 489 F.2d 51, 62 (5th Cir.1973), *cert. denied,* 417 U.S. 945, 94 S.Ct. 3067, 41 L.Ed.2d 664 (1974); *see United States v. Scott,* 555 F.2d 522, 530 (5th Cir.1977) (internal personnel changes did not begin new conspiracy).

**19.** *See Perez,* 489 F.2d at 62–63; *United States v. Lloyd,* 425 F.2d 711, 712 (5th Cir.1970) (citing *Braverman v. United States,* 317 U.S. 49, 63 S.Ct. 99, 87 L.Ed.2d 23 (1942)) (an agreement to commit a number of offenses does not become several conspiracies because the activity continues over a period of time).

less it prejudiced Richerson's substantial rights. In determining prejudice to substantial rights, the Supreme Court, in *Berger v. United States,* 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314 (1935), looked at whether the variance (1) caused surprise at trial, or (2) left the defendant vulnerable to a later prosecution because of a failure to make clear the offense for which he had been tried. *See Perez,* 489 F.2d at 60 and n. 13. Richerson does not, and on the evidence really cannot, complain of either surprise or double jeopardy.

The most common prejudice to a substantial right resulting from a variance is transference of guilt. Courts have recognized their duty to protect those tried en masse on a conspiracy count from possible transference of guilt from other joint defendants.[20] Richerson does not, of course, complain of prejudice through guilt transference because he was (1) involved in all of the conspiracies, if indeed there was more than one, *and* (2) tried alone.

Richerson, instead, complains of prejudice through lack of unanimity in the jury verdict. Richerson bases his lack of unanimity argument on the jury's acquittals on the substantive mail fraud counts. These acquittals, however, are irrelevant.[21] He has no other basis for his assertion other than speculation.

This court, in several cases, has rejected defendants' arguments for reversal due to a variance because we found no substantial prejudice. In *United States v. L'Hoste,* 609 F.2d 796 (5th Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 104, 66 L.Ed.2d 39 (1980) the court stated that "If the Government proves multiple conspiracies and a

defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights." *Id.* at 801; *see also United States v. Martino,* 648 F.2d 367, 382 (5th Cir. 1981), *cert. denied,* 456 U.S. 943, 102 S.Ct. 2006, 72 L.Ed.2d 465 (1982). In this case, the Government clearly proved at least one conspiracy; if the Government proved multiple conspiracies it clearly proved Richerson's involvement in at least one of them. As a result there is no variance affecting Richerson's substantial rights.

### C. Plain Error

■ The jury should decide the question of single versus multiple conspiracies. *United States v. Rodriguez,* 509 F.2d 1342, 1348 (5th Cir.1975); *Paz v. United States,* 462 F.2d 740, 743 (5th Cir.1972). The district court did not submit this issue to the jury. Fed.R.Crim.P. 30 provides that "[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection." Richerson did not object to the district court's charge. Fed.R.Crim. P. 52(b), however, provides that this court may notice error if it constitutes plain error, that is, error "so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings and result in a miscarriage of justice." *United States v. Bi–Co Pavers, Inc.,* 741 F.2d 730, 735 (5th Cir.1984) (quoting *United States v. Howton,* 688 F.2d 272, 278 (5th Cir.1982)).

---

20. *Perez,* 489 F.2d at 57. In *Kotteakos v. United States,* 328 U.S. 750, 775, 66 S.Ct. 1239, 1253, 90 L.Ed. 1557 (1946), the government obtained a single count conspiracy indictment against multiple defendants and then, on appeal, admitted that the trial evidence had proved eight separate conspiracies. The key man, who participated in and directed all eight conspiracies pleaded guilty before trial. Although the petitioners were tried jointly, none of them took part in more than one of the conspiracies. The Court, concerned with transference of guilt, held this variance fatal and reversed the petitioners' convictions. In 1972 this court noted that *"Kotteakos* has been closely restricted to its particular facts, and ... most courts have been willing to

find that evidence is sufficient to establish a single conspiracy where clear overlapping of membership and activities, all directed toward a single common goal, is present." *United States v. Morado,* 454 F.2d 167, 171–72 (5th Cir.1972).

21. *See Dunn v. United States,* 284 U.S. 390, 399, 52 S.Ct. 189, 192–93, 76 L.Ed. 356 (1932) (inconsistency between verdicts on separate counts does not require reversal of convictions on counts on which the jury found defendant guilty); *United States v. Michel,* 588 F.2d 986 (5th Cir.1979); *United States v. Lloyd,* 425 F.2d 711, 713 (5th Cir.1970).

In *United States v. Vicars,* 467 F.2d 452 (5th Cir.1972), *cert. denied,* 410 U.S. 967, 93 S.Ct. 1451, 35 L.Ed.2d 702 (1973), the district court did not charge the jury on the multiple conspiracy issue. The defendant, Vicars, did not object to the trial court's failure to make a specific charge on the number of conspiracies. This court therefore refused to reverse Vicars' conviction because he had not established that the trial court's failure to charge on the number of conspiracies constituted plain error. *Id.* at 454. Similarly, this court cannot reverse Richerson's conviction unless Richerson establishes that the district court's failure to give the multiple conspiracy instruction was plain error. He has not done so.

### III. INTANGIBLE RIGHTS—MAIL FRAUD INSTRUCTION

On June 24, 1987, the Supreme Court, in *McNally v. United States,* ____ U.S. ____, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987), held that a scheme defrauding state citizens of their intangible rights to honest and impartial government did not constitute mail fraud under 18 U.S.C. § 1341.[22] The Court noted, however, that the mail fraud statute clearly protects property rights and that courts should construe the statute broadly with regard to property rights.[23]

Richerson contends that the *McNally* decision requires reversal of his conviction because the district court's charge included language regarding intangible rights.[24] The district court instructed the jury that:

> [A]cceptance by an employee of kickbacks from those supplying materials and equipment to his employer constitutes "a scheme to defraud" within the scope of the mail fraud statute.

> Now, the object of a fraudulent scheme need not be the deprivation of a tangible interest. Artifices designed to cause losses of an intangible nature also violate the statute.

> Employees have a fiduciary duty to their employer not to conceal facts that they have reason to believe are material to their employer's conduct of its business. Such concealment deprives the employer of his honest and loyal services and of the employer's right to have its business conducted honestly.

> A scheme to defraud an employer of the right to the honest and faithful services of its employee may constitute a "scheme or artifice to defraud" as that phrase is used in the mail fraud statute. However, mere breach of a fiduciary duty by itself is not enough to support a statutory violation. Where any employee breaches a duty to his employer by concealing material information which he has a duty to disclose and where such non-disclosure may result in harm to the employer, the act constitutes a scheme to defraud within the purview of the statute. Therefore, non-disclosure of materi-

**22.** 107 S.Ct. at 2881 (noting that the contrary holding would leave the outer scope of the statute ambiguous and result in the federal government setting standards for disclosure and good government for state and local officials). The *McNally* Court noted that the jury did not have to find that the defendants deprived Kentucky of money or property or control over the spending of money. Although the *McNally* Court dealt specifically with substantive mail fraud convictions, not in issue here, the decision is equally applicable to Richerson's conviction for conspiracy to commit mail fraud. *See id.* at 2882 (government conceded that reversal of substantive convictions also required reversal of conspiracy convictions).

**23.** *Id.* 107 S.Ct. at 2879–80 (citing *Durland v. United States,* 161 U.S. 306, 16 S.Ct. 508, 40 L.Ed. 709 (1896)).

**24.** The conspiracy count of the indictment alleged that Richerson violated 18 U.S.C. § 1341 through a "scheme and artifice to defraud and to obtain money and property by means of false and fraudulent pretenses, representations and promises." According to the indictment the object and purpose of the conspiracy was "to obtain in excess of One Hundred Thousand Dollars ($100,000) in money and property from vendors of Pool and ultimately Pool through the use of false and fraudulent pretenses, and to conceal this scheme to defraud." All of this language deals with money and property. The indictment, however, included among five listed ways and means to accomplish the conspiracy "[t]he concealment from Pool that the defendant was not a loyal, faithful and honest employee." Richerson argues that this concealment is intangible.

al information may constitute mail fraud where an employee conceals information from an employer which the employee has reason to believe would lead a reasonable employer to change its business conduct.

Because the charge was given before the Supreme Court decided *McNally* neither party objected to the "intangible violation" language at trial. On appeal, however, after the *McNally* decision, Richerson objects.

The *McNally* majority's new interpretation of the mail fraud statute clearly varies from all of the previous appellate court decisions regarding the intangible rights theory of mail fraud. The *McNally* majority did not explicitly discuss the effect of its holding on intangible mail fraud cases involving intangibles other than the "citizens' intangible right to honest and impartial government." In his dissenting opinion, however, Justice Stevens addressed the issue of *McNally's* effect on cases involving employee fraud. Justice Stevens said:

> When a person is being paid a salary for his loyal services, any breach of that loyalty would appear to carry with it some loss of money to the employer—who is not getting what he paid for. Additionally, "[i]f an agent receives anything as a result of his violation of a duty of loyalty to the principal, he is subject to a liability to deliver it, its value, or its proceeds, to the principal." Restatement (Second) of Agency § 403 (1958). This duty may fulfill the Court's "money or property" requirement in most kickback schemes.[25]

The *McNally* majority did not disagree with Justice Stevens' comments regarding employee's breaches of loyalty. *See United States v. Fagan,* 821 F.2d 1002, 1010 n. 6 (5th Cir.1987).

The Supreme Court's November 16, 1987 decision in *Carpenter v. United States,* — U.S. ——, 108 S.Ct. 316, 98 L.Ed.2d 275 (1987), provides guidance regarding the Court's application of the mail fraud statute to intangibles. In *Carpenter* an employee who disclosed his employer's confidential information was convicted of mail and wire fraud under 18 U.S.C. §§ 1341, 1343 and conspiracy to commit mail fraud under 18 U.S.C. § 371. The Court affirmed the employee's conviction saying that "*McNally* did not limit the scope of § 1341 to tangible as distinguished from intangible property rights." *Id.* 108 S.Ct. at 320. The Court also said that a scheme to defraud does not require a monetary loss. *Id.* The Court, however, noted that the defendant's employer "was defrauded of much more than its contractual right to his honest and faithful service, an interest too ethereal in itself to fall within the protection of the mail fraud statute, which 'had its origin in the desire to protect individual property rights.' " *Id.* (quoting *McNally,* 107 S.Ct. at 2881 n. 8).

In this case the overriding and predominant theory of the Government's case involved Pool's loss of money and property. To the extent that this case involved intangibles at all they were related to property as suggested by Justice Stevens' dissent and as required by the Court's decision in *Carpenter.* Richerson's concealment of material information from his employer is analogous to the *Carpenter* defendant's disclosure of his employer's material information. Although, in light of the *Carpenter* Court's dicta, the reference to "honest and faithful service of the employee" in the instruction given by the district court may have been incorrect the instruction required a finding that Richerson breached his duty of loyalty through concealment of material information. This concealment affected Pool Offshore's property rights.

In any event any error in the district court's charge does not rise to the level of plain error.[26] The Government presented

---

25. 107 S.Ct. at 2890 n. 10; *see also United States v. Fagan,* 821 F.2d 1002, 1010 n. 6 (5th Cir.1987) (quoting with approval same language from Justice Stevens' dissent in deciding question of sufficiency of the evidence; defect in charge not raised by parties).

26. Plain error is, as stated above, error "so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings and result in a miscarriage of justice." *United States v. Bi–Co Pavers, Inc.,* 741 F.2d 730, 735 (5th Cir.1984)

substantial evidence of Pool's loss of money and property. The intangible instruction referred to Richerson's deprivation of Pool Offshore's property rights through concealment of material information. As a result, the intangible mail fraud instruction neither affected Richerson's substantial rights, nor prejudicially impacted the jury's deliberations on the conspiracy count.

## IV. BURDEN OF PROOF INSTRUCTION ON TAX COUNTS

■■■■■■ At the beginning of the charge the district court gave a general burden of proof instruction, requiring that the Government prove Richerson's guilt beyond a reasonable doubt. With regard to the tax counts the district court specifically instructed the jury that:

> In order to establish that offense, the Government must prove both of the following elements beyond a reasonable doubt:
>
> *First:* That substantial income tax was due and owing from the Defendant in addition to that declared in his tax return; and
>
> *Second:* That the Defendant knowingly and willfully attempted to evade or defeat such tax.

The district court followed this instruction with various definitions including "*A taxpayer must show* that a transfer of property is out of 'detached and disinterested generosity' in order to be classified as a gift. The test for determining whether the property is a gift is the donor's intent." (Emphasis added). The four italicized

words, "[a] taxpayer must show" are clearly incorrect. The defendant does not have the burden to prove anything in a criminal case.[27] Again, however, because neither party objected to these four words at trial, the plain error doctrine governs our review. A court must consider jury instructions as a whole. *Cupp v. Naughten,* 414 U.S. 141, 146–47, 94 S.Ct. 396, 400, 38 L.Ed.2d 368 (1973) ("a single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge"). Plain error is, as stated above, error "so obvious that our failure to notice it would seriously affect the fairness, integrity, or public reputation of [the] judicial proceedings and result in a miscarriage of justice." *United States v. Bi-Co Pavers, Inc.,* 741 F.2d 730, 735 (5th Cir. 1984) (quoting *United States v. Howton,* 688 F.2d 272, 278 (5th Cir.1982)). Plain error must seriously affect substantial rights and have an unfair prejudicial impact on the jury's deliberations. *United States v. Young,* 470 U.S. 1, 17 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985). No certainty exists in decisions of this character. Our conclusion is, however, that these four words, in the context of a charge spanning thirty-six pages of the record, could not have had enough impact to have affected the jury's decision.[28] There are very few cases tried without some error. It is for this reason that our jurisprudence has injected into the process of finding reversible error the requirement that the error must be plainly plain at least where no objection was raised at trial. If we hold that plain error existed in this case

---

27. *See In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 1072–73, 25 L.Ed.2d 368 (1970) (due process requires proof beyond a reasonable doubt of every fact necessary to convict the defendant).

(quoting *United States v. Howton,* 688 F.2d 272, 278 (5th Cir.1982)). Plain error must seriously affect substantial rights and have an unfair prejudicial impact on the jury's deliberations. *United States v. Young,* 470 U.S. 1, 17 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985). Under the plain error rule, this court must consider Richerson's claim of prejudice in light of the entire record. *United States v. Garza,* 807 F.2d 394, 397 (5th Cir.1986); *United States v. Brown,* 692 F.2d 345, 350 (5th Cir.1982).

28. Richerson relies on the Fourth Circuit's decision in *United States v. Mogavero,* 521 F.2d 625 (4th Cir.1975). In *Mogavero,* the Fourth Circuit required reversal of the defendant's conviction for filing false and fraudulent income tax returns because the jury instructions shifted the burden of proof on the defendant's theory for the source of the funds in question. The *Mogavero* decision is, however, easily distinguished for two reasons. First, the erroneous instruction spanned four paragraphs, instead of just four words. *See id.* at 627. Second, the plain error rule did not govern the Fourth Circuit's decision because the defendant had requested a proper instruction. *See id.*

it would be difficult to believe that any erroneous words uttered by any court would not be plain error. As a result we must also affirm the defendant's conviction on the tax counts.

AFFIRMED.