# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

January 22, 2021

Lyle W. Cayce
Clerk

No. 19-10805

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

JONATHON EDWARD WARREN; ANTONIO ENRIQUE MARTINEZ,

*Defendants—Appellants*.

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:15-CR-65

Before WIENER, COSTA, and WILLETT, *Circuit Judges*.
DON R. WILLETT, *Circuit Judge*:

The timeshare market has spawned a cottage industry of cancellation firms claiming they can help desperate timeshare owners unload their unwanted vacation rentals. It's a market ripe for scammers. In this case, a jury convicted Antonio Martinez and Jonathan Warren on multiple federal charges for their roles in a telemarketing timeshare-exit scam that bilked millions from owners eager to escape timeshares they could no longer afford. They appeal their convictions and sentences on numerous grounds. We affirm.

I

This case involves the "heat pitch," a high-pressure scheme to defraud those hoping to extricate themselves. Telemarketers from phony real estate advertising firms would contact timeshare owners and falsely represent that buyers are lined up for their timeshares. Then, the telemarketers charged the owners marketing and closing fees for the purported sale. The fees ranged from $1,000–$7,000, depending on the fake sale amount and how much the telemarketers thought each timeshare owner would be willing to pay. The key was to string the owners along about the supposed sale for enough time to avoid credit card disputes and chargebacks, typically 90–120 days. At the outset, owners were told that it would take a minimum of 120 days for the sale to be finalized. Telemarketers would use "lulling" scripts to reassure anxious or suspicious owners. For example, they would pretend the buyer had an outstanding tax lien that would take another 30 days to resolve. The process ended when the timeshare owners gave up and stopped calling or when the company turned its phones off and the owners could not get in touch with anybody.

The telemarketers employed various tactics to cover their tracks from credit card companies and the authorities. After first contacting a timeshare owner, the telemarketers would stage a "verification" call, in which they asked the owner to falsely state that no buyer had been promised. To convince the owners to play along on the verification call, the telemarketers would explain that it was necessary to follow this procedure because, as marketing and advertising agents, they could not officially match buyers until a property was listed. Most of the owners agreed to lie on the verification calls because they were desperate to sell their timeshares. The telemarketers would then send marketing and advertising contracts to the owners. When facing credit card disputes or complaints from government agencies, the

telemarketers would provide the verification call and the contract as evidence that they only agreed to market and advertise, not sell, the timeshare.

Even so, credit card chargebacks by timeshare owners were common. While retail merchants generally have chargeback rates below 1%, the fraudulent telemarketing operations had chargeback rates of 10–15% or more. The fraud thus depended on having a merchant processor—the third party that processes credit card transactions—who was willing to accept the risk.

The fraud also depended on concealing the location and identity of the telemarketers. The companies would use fake addresses and telephone numbers that appeared to come from out of state. They would also change their names every six months. Similarly, the telemarketers would use fictitious names on the phone and would change their pseudonyms to stay ahead of bad online reviews.

Martinez's role in the scheme began in 2009, when he was approached by his friend Richard Mendez about starting a timeshare resale telemarketing business. Mendez was in bankruptcy at the time and needed somebody with good credit to serve as a business partner; Martinez agreed. Martinez incorporated the company JAMS Management of Central Florida, applied for the fictitious "doing business as" name Resorts Condos Management, opened a bank account, and opened a merchant processor account for Mendez. He also rented office space to Mendez. By mid-2009, Mendez was operating Resorts Condos Management and his telemarketers were using the fraudulent heat pitch. At first, Martinez did not play a major role in the operation and, at trial, he claimed not to know that Mendez's telemarketers were using the heat pitch. However, Mendez and one of his managers, Max Chilson, testified that Martinez was aware of the fraud and that by fall of 2009, Martinez was managing his own satellite telemarketing

operation under Mendez. At some point, the operation reincorporated as Vision Ventures, Inc. doing business as Timeshare Goldline.

In March 2010, Martinez changed the locks at the office that he rented to Mendez and transferred the operation's money into an account in his name. He claims that he acted out of concern about the effect the operation was having on his credit. Mendez and Chilson claim that he wanted more control and a larger share of the operation's proceeds. According to Martinez, after the lockout he proceeded to work on his own painting and fuel additive businesses and had nothing to do with Mendez. However, Mendez testified that he gave Martinez his own satellite telemarketing operation to manage after the lockout.

In summer 2010, Martinez went into the timeshare business on his own. He claimed that he was operating a legitimate advertisement and marketing firm, which included publishing a magazine. However, Chilson, Gunner Jenkins, Eric Rosado, and Peter Guillette all claimed to be running fraudulent telemarketing operations under Martinez and using his merchant processor account. According to Chilson and Jenkins, the magazine was merely an attempt to conceal the fraud.

Warren joined the scheme sometime in 2009. His company, VoiceOnyx, provided phone, internet, and database services to Mendez's and Chilson's fraudulent telemarketing operations. He set up the telephone numbers so they appeared to come from the operations' fake addresses. He also consulted about switching the business names, moving customers from one company to the next without raising suspicion, and avoiding law enforcement. He was aware that the telemarketing operations used the fraudulent heat pitch.

In September 2016, a grand jury returned a superseding indictment alleging that Martinez, Warren, Mendez, Angelina Smith, and Harold Smith

conspired to commit mail fraud, wire fraud, and bank fraud, in violation of 18 U.S.C. § 1349; aided and abetted each other in committing mail fraud on five dates between March 15 and November 19, 2010, in violation of 18 U.S.C. §§ 2 and 1341; and aided and abetted each other in committing wire fraud on March 28 and April 9, 2010, in violation of 18 U.S.C. §§ 2 and 1343. The superseding indictment also charged that each offense occurred in connection with the conduct of telemarketing and victimized ten or more persons over the age of 55, which, if proven, allows a sentencing enhancement of up to ten years under 18 U.S.C. § 2326.

Martinez and Warren proceeded to trial in January 2018. The prosecution presented 20 witnesses, including 11 timeshare owners. Martinez testified in his own defense and presented testimony from Jose Ayala, Mendez's accountant. Warren presented testimony from Elizabeth Allen, a VoiceOnyx employee; Edward Warren, his father and a VoiceOnyx employee; James Fort, a software developer in the timeshare industry; and Curtis Binney, an accountant.

In mid-February 2018, the jury convicted Martinez and Warren of all eight counts and found the telemarketing sentencing enhancement applicable to each count. The district court set aside the verdict on the sentencing enhancement because the evidence established only that the offenses were committed in connection with the conduct of telemarketing, and not that they victimized ten or more persons over the age of 55. The ruling limited the available sentencing enhancement to five years, not ten.

Martinez was sentenced to 108 months on the eight counts of conviction plus six months consecutive under the telemarketing enhancement, for a total of 114 months, followed by three years of supervised release. He was ordered to pay $5,573,045.84 in restitution. Warren was sentenced to 96 months on the eight counts of conviction plus six months

No. 19-10805

consecutive under the enhancement, for a total of 102 months, followed by three years of supervised release. He was ordered to pay $291,854.58 in restitution. Martinez and Warren timely appealed.

## II

The district court had jurisdiction under 18 U.S.C. § 3231. We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

## III

On appeal, Martinez argues that the evidence was insufficient to support his convictions and that the district court's restitution order violated his Sixth Amendment right to a jury trial. Warren argues that the district court erred by treating him as a "manager or supervisor" of the criminal activity and applying the corresponding offense-level increase under § 3B1.1 of the Sentencing Guidelines. Both Martinez and Warren argue that the district court erred by admitting statements under the co-conspirator exception to the hearsay rule and that the district court erred in imposing consecutive six-month sentences under 18 U.S.C. § 2326(1).

## A

We first address Martinez's argument that the evidence was insufficient to support his convictions for conspiracy (Count One), mail fraud (Counts Two through Six), and wire fraud (Counts Seven and Eight). Because Martinez properly preserved his argument by moving for a judgment of acquittal in the district court, our review is de novo.[1] We must consider the evidence and draw all inferences in favor of the verdict.[2] And we must

---

[1] *United States v. Danhach*, 815 F.3d 228, 235 (5th Cir. 2016).

[2] *United States v. Hoffman*, 901 F.3d 523, 541 (5th Cir. 2018).

affirm "unless no rational juror could have found guilt beyond a reasonable doubt."[3]

1

Martinez argues that the evidence does not support the jury's finding that a single conspiracy existed from March 2009 to March 2011, as charged in Count One. Instead, he contends that the Government offered proof of one conspiracy, led by Mendez from early 2009 through early 2011, and a second conspiracy, led by Martinez from mid-2010 until early 2011. "The question of whether the evidence establishes the existence of a single conspiracy or multiple conspiracies is a question of fact for the jury."[4] The jury's finding must be affirmed "unless the evidence and all reasonable inferences, examined in the light most favorable to the government, would preclude reasonable jurors from finding a single conspiracy beyond a reasonable doubt."[5] "The principal considerations in counting the number of conspiracies are (1) the existence of a common goal; (2) the nature of the scheme; and (3) the overlapping of the participants in the various dealings."[6]

Martinez concedes that the second and third factors are met. He argues only that there was no evidence of a "common goal" after the failed March 2010 lockout because he and Mendez became competitors at that point. As support, he cites the Second Circuit case *United States v. Reiter*, in which the fact that two narcotics distribution enterprises were competitors was evidence that they were distinct conspiracies.[7] But *Reiter* was a Double

---

[3] *United States v. Sanjar*, 876 F.3d 725, 744 (5th Cir. 2017).

[4] *United States v. Beacham*, 774 F.3d 267, 273 (5th Cir. 2014).

[5] *Id.* (quoting *United States v. Simpson*, 741 F.3d 539, 548 (5th Cir. 2014)).

[6] *Id.* (quoting *United States v. Mitchell*, 484 F.3d 762, 770 (5th Cir. 2007)).

[7] 848 F.2d 336, 341 (2d Cir. 1988).

Jeopardy case, not a sufficiency-of-the-evidence case.[8] The question there was whether, on the face of the indictment, a different conspiracy had been alleged than in previous cases.[9] The court concluded that the new case charged a separate conspiracy, taking a deferential view of the indictment.[10] Our question is whether the jury could have determined that a single conspiracy existed, giving deference to the verdict. So, while the inquiries look similar, the baselines are different: *Reiter* started from the proposition that there were separate conspiracies; we start from the proposition that there was just one.

In considering the sufficiency of the evidence that a single conspiracy existed, we "have applied the criteria for a common goal broadly, such that the 'test may have become a matter of semantics.'"[11] A common goal is "shown when alleged co-conspirators all sought 'personal gains' through some participation in a broad conspiracy scheme."[12] That is a low hurdle. Here, the jury could have easily inferred that the co-conspirators shared a common goal to profit through their participation in the telemarketing scheme during the time period alleged in the indictment.

2

Martinez also argues that the evidence does not support the jury's finding that he aided and abetted mail fraud as charged in Counts Two through Six and wire fraud as charged in Counts Seven and Eight. "The

---

[8] *Id.* at 337.

[9] *Id.* at 340.

[10] *Id.* at 340–41.

[11] *Beacham*, 774 F.3d at 273 (quoting *United States v. Richerson*, 833 F.2d 1147, 1153 (5th Cir. 1987)).

[12] *Id.* (citing *Richerson*, 833 F.2d at 1153).

federal aiding and abetting statute, 18 U.S.C. § 2, states that a person who furthers—more specifically, who 'aids, abets, counsels, commands, induces or procures'—the commission of a federal offense 'is punishable as a principal.'"[13] "[A] person is liable under § 2 for aiding and abetting a crime if (and only if) he (1) takes an affirmative act in furtherance of that offense, (2) with the intent of facilitating the offense's commission."[14]

Martinez does not argue that he lacked the requisite intent. Instead, he contends that the evidence doesn't connect him to the particular offenses alleged. For example, he emphasizes that no evidence linked any of the named timeshare owners to the telemarketing operation that he managed for Mendez in 2010. He thus argues that unidentified telemarketers in any part of Mendez's operations could have committed the fraud. Martinez reads the "affirmative act" requirement far too narrowly.

The Government need only prove that Martinez "associated with, participated in, and acted to help the" offense.[15] It does not need to show that he "was present when the crime was committed or that he actively participated."[16] In *United States v. Sanders*, this court affirmed convictions for aiding and abetting health care fraud and wire fraud without analyzing the defendants' precise roles in each count. Rather, it was enough that the defendants had, among other things, pushed employees to maximize billing, fired an employee for refusing to lie, and moved money around after learning that search warrants had been served.[17] Here, Martinez was involved in the

---

[13] *Rosemond v. United States*, 572 U.S. 65, 70 (2014).

[14] *Id.* at 71.

[15] *United States v. Sanders*, 952 F.3d 263, 278 (5th Cir. 2020).

[16] *Id.* at 277 (internal quotation marks omitted).

[17] *Id.* at 278.

scheme from the very beginning, when he incorporated the telemarketing company, secured its merchant processor account, and provided the office space. Later, he directly managed various fraudulent operations, first on behalf of Mendez and then on his own. Viewing this evidence in the light most favorable to the verdict, the jury did not act irrationally in convicting Martinez.

Next, Martinez contends that he could not have aided and abetted the mail fraud charged in Counts Four, Five, and Six because those offenses occurred after his split with Mendez. He ignores that the fraudulent communications with those named timeshare owners began before he left Mendez's operation. And again, aiding and abetting liability doesn't require presence.[18] The jury could have reasonably concluded that the affirmative steps that Martinez took to get the fraud up and running were done in furtherance of the offenses that occurred at the end of and after his relationship with Mendez.

Finally, Martinez contends that he could not have aided and abetted the mail fraud charged in Counts Two, Four, Five, and Six because the evidence did not establish that those offenses occurred. Specifically, he argues that those counts concerned letters requesting refunds sent by the timeshare owners, which are not mailings "in furtherance" of the fraud, as required for a conviction.[19] But the fact that a mailing was sent by the victim rather than the perpetrator is immaterial; the inquiry is whether the communication was in furtherance of the fraud.[20] Further,

---

[18] *Sanders*, 952 F.3d at 277 (citing *United States v. James*, 528 F.2d 999, 1015 (5th Cir. 1976)).

[19] *See Hoffman*, 901 F.3d at 546 (discussing the "in furtherance" element).

[20] *See United States v. Phipps*, 595 F.3d 243, 247 (5th Cir. 2010) (finding that a participant's fax updating her contact information in anticipation of future payments

No. 19-10805

"[c]ommunications that occur after initial purchase into the fraudulent scheme, designed to lull the victim into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect, are mailings in furtherance of the scheme."[21] Here, testimony established both that the telemarketers employed various lulling tactics and that avoiding chargebacks was key to the fraud. The timeshare owners named in Counts Two, Four, Five, and Six specifically testified about the false assurances they were given. One even testified that he was told to send a letter requesting a refund. Construing this evidence in the light most favorable to the verdict, a reasonable jury could have found that letters requesting refunds were part of the lulling process and thus were in furtherance of the fraud.

B

Next, we address Martinez and Warren's argument that the district court improperly permitted the timeshare owners to testify about their conversations with telemarketers under the co-conspirator exception to the hearsay rule. Where a party timely objects at trial, evidentiary rulings are reviewed for abuse of discretion.[22] Otherwise, review is only for plain error.[23] Here, Martinez objected only to the testimony of timeshare owner William DeVoe, and Warren failed to object at all. We thus review for plain error, except as to the ruling on DeVoe's testimony.

---

supported a conviction); *United States v. Toney*, 598 F.2d 1349, 1353 (5th Cir. 1979) (discussing "the well-established rule that mailings from the victims can be mailed in execution of the fraud").

[21] *Phipps*, 595 F.3d at 246–47 (internal quotation marks and alteration omitted); *see also United States v. Allen*, 76 F.3d 1348, 1363 (5th Cir. 1996).

[22] *United States v. Polasek*, 162 F.3d 878, 883 (5th Cir. 1998).

[23] *Id.*; FED. R. CRIM. P. 51(b); FED. R. EVID. 103(e).

No. 19-10805

As an initial matter, Martinez and Warren fail to identify any specific statements that were improperly admitted. For that reason, they cannot show error or an abuse of discretion.[24] In any event, the testimony to which they broadly object is not hearsay because it was not offered to prove the truth of the matter asserted.[25] Indeed, the significance of the telemarketers' statements was that they were false—the supposed buyers for the timeshares never existed, the so-called marketing and closing fees were illegitimate, and the assurances were merely to lull the timeshare owners. The case *United States v. McDonnel* is instructive.[26] There, the victims of mail fraud were allowed to testify about representations made to them by the defendant's salesmen and brokers under the co-conspirator exception to the hearsay rule.[27] On appeal, we explained that "the point was to prove that the statements were made so as to establish a foundation for later showing, through other admissible evidence, that they were false. The hearsay rule does not apply."[28] The co-conspirator exception was thus "superfluous."[29] So too here. Because the telemarketers' statements were not hearsay, their admission was not error.

---

[24] *United States v. Acosta*, 763 F.2d 671, 680 (5th Cir. 1985) ("Because none of the other appellants have identified on appeal the particular hearsay statements they allege to have been erroneously admitted, we decline to *sua sponte* search the record for the possible statements to which they might have objected. In essence, by failing to make their arguments with specificity, they have waived their right to any further consideration of them by this Court on appeal.").

[25] *See* FED. R. EVID. 801(c) (defining "hearsay").

[26] 550 F.2d 1010 (5th Cir. 1977).

[27] *Id.* at 1011.

[28] *Id.* at 1012.

[29] *Id.*

No. 19-10805

C

We now turn to Warren and Martinez's argument that the district court erred by imposing consecutive six-month sentences under 18 U.S.C. § 2326(1). The district court's interpretation of a sentencing statute is reviewed de novo.[30] But because Warren failed to object, his sentence will only be vacated if the district court's interpretation amounted to plain error.[31]

A statute's plain meaning controls unless the result would be absurd.[32] Under § 2326(1),

> [a] person who is convicted of an offense under section 1028, 1029, 1341, 1342, 1343, 1344, or 1347 or section 1128B of the Social Security Act (42 U.S.C. 1320a-7b), or a conspiracy to commit such an offense, in connection with the conduct of telemarketing or email marketing . . . shall be imprisoned for a term of up to 5 years in addition to any term of imprisonment imposed under any of those sections, respectively.

Warren and Martinez contend that this provision merely raises the statutory maximum sentence for the underlying fraud conviction. But that position is at odds with the plain meaning of "in addition to any term of imprisonment imposed under any of those sections." That language contemplates separate sentences for the underlying offense and the telemarketing enhancement. By its own terms, the statute does not alter the available sentence for the underlying offense. Instead, it requires a consecutive sentence, as the district court imposed here.

As a matter of common usage, we have regularly described consecutive sentences as being "in addition to" the sentence for the

---

[30] *United States v. Salazar*, 542 F.3d 139, 144 (5th Cir. 2008).

[31] *United States v. Alfaro-Hernandez*, 453 F.3d 280, 281 (5th Cir. 2006).

[32] *United States v. Lagrone*, 773 F.3d 673, 675 (5th Cir. 2014).

underlying or other offense.[33] And applying that same plain meaning here is consistent with the limited authority on § 2326(1). In the unpublished case *United States v. Guerrero*, we held that a consecutive sentence imposed under § 2326 was not plain error.[34]

In arguing to the contrary, Warren and Martinez cite *United States v. Dison*, which held that a defendant who fails to appear in violation of 18 U.S.C. § 3146 is subject to a consecutive sentence under § 3147.[35] We explained that "regardless of the fact that § 3147 calls for punishment 'in addition to the sentence prescribed' for the underlying offense, the § 3147 enhancement can never result in a sentence in excess of the statutory

---

[33] *United States v. Still*, 102 F.3d 118, 121 n.1 (5th Cir. 1996) ("The record is unclear regarding whether Still's attorney and the prosecutor represented to Still that he faced a range of 70–87 months on counts one, two, four, five and six, in addition to the consecutive sixty month sentence on count three, or whether they failed to mention the sixty month sentence to Still."); *United States v. Riggio*, 70 F.3d 336, 339 (5th Cir. 1995) ("The district court acted properly in imposing the consecutive sentence of 60 months for the use of fire in addition to the sentence imposed for conspiracy."); *United States v. Valdez*, 830 F. App'x 137, 139 (5th Cir. 2020) ("Valdez was required, in addition to his drug-trafficking-offense sentence, to 'be sentenced to a [consecutive] term of imprisonment of not less than 5 years.'" (alteration in original)); *United States v. Barrett*, 403 F. App'x 963, 964 (5th Cir. 2010) ("Under § 3147, a defendant convicted of an offense committed while on release shall be sentenced, in addition to the sentence for the underlying offense, to a separate consecutive term of imprisonment."); *United States v. Williams*, 373 F. App'x 451, 456 (5th Cir. 2010) ("The USSG recognizes that the sanction for violation of trust should be consecutive (in addition) to the sentence imposed on the basis of the defendant's new criminal conduct."); *United States v. Foots*, 340 F. App'x 969, 975 (5th Cir. 2009) ("As to the procedural prong of our analysis, section 924(c)(1)(A) requires that a consecutive sentence be imposed in addition to the punishment for the crime of violence at issue.").

[34] 31 F. App'x 836 (5th Cir. 2002); *see also United States v. Griffin*, 815 F. App'x 745, 746 (4th Cir. 2020) (mem. op.) (affirming consecutive sentence under § 2326); *United States v. Francis*, No. 8:19-CR-9-T-60SPF, 2020 WL 4925323, at *3 (M.D. Fla. Aug. 21, 2020) (describing § 2326(2)(B) as authorizing "a mandatory consecutive sentence of up to 10 years of imprisonment as to each count").

[35] 573 F.3d 204, 210 (5th Cir. 2009).

maximum prescribed for the offense committed while on release, here failure to appear."[36] But it's not clear how this language furthers Warren and Martinez's argument, given that neither was sentenced in excess of the statutory maximums for their underlying fraud offenses.[37]

To be sure, the Government's argument that § 3147 and other sentencing enhancement statutes have been interpreted to require consecutive sentences is unavailing. That's because at least two of the three statutes cited by the Government explicitly state that the sentences imposed under them shall be consecutive.[38] But Congress's failure to be so explicit in § 2326 does not alter the plain meaning of "in addition to." Because the statute is clear, the rule of lenity is inapplicable.[39] As written, § 2326

---

[36] *Id.* at 209.

[37] *See* 18 U.S.C. § 1341 (statutory maximum for mail fraud is 20 years); § 1343 (statutory maximum for wire fraud is 20 years).

Warren and Martinez also cite *Mangarella v. United States* from the Western District of North Carolina. No. 3:13-CV-555, 2014 WL 1608483 (W.D.N.C. Apr. 22, 2014). There, the court explained that under § 2326, "the United States sought to increase the maximum punishment for each wire fraud count of conviction by an additional 107 years— i.e., from 20 years per count to 30 years per count, based on its contention that Petitioner's telemarketing scheme 'victimized ten or more persons over the age of 55' or 'targeted persons over the age of 55.'" *Id.* at *4 (quoting § 2326(2)). But that was a habeas case considering whether counsel was ineffective for failing to object to certain sentencing enhancements. It did not purport to interpret the statute, and its characterization is an outlier.

[38] 18 U.S.C. § 3147 ("A term of imprisonment imposed under this section shall be consecutive to any other sentence of imprisonment."); 18 U.S.C. § 924(c)(1)(D) ("Notwithstanding any other provision of law . . . no term of imprisonment imposed on a person under this subsection shall run concurrently with any other term of imprisonment imposed on the person, including any term of imprisonment imposed for the crime of violence or drug trafficking crime during which the firearm was used, carried, or possessed.").

[39] *United States v. Orellana*, 405 F.3d 360, 371 (5th Cir. 2005) (rule of lenity applies only when a statute is ambiguous).

No. 19-10805

authorizes a consecutive sentence to be imposed on top of the sentence for the underlying fraud offense.

D

We next consider Warren's argument that the district court erred at sentencing by determining that he was a "manager or supervisor" and applying a three-level increase to his offense level under § 3B.1.1(b) of the Sentencing Guidelines. A defendant's role in the offense is a factual finding reviewed for clear error.[40] "A factual finding is not clearly erroneous if it is plausible in light of the record read as a whole."[41]

Under § 3B1.1, a defendant's aggravating role in criminal activity results in an increased offense level. Specifically, § 3B1.1 states:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.
>
> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.

Warren does not dispute that the criminal activity involved five or more participants. The only issue is whether he was a "manager or supervisor." Application Note 4 lists seven factors to consider: (1) "the exercise of decision making authority," (2) "the nature of participation in the

---

[40] *United States v. Akins*, 746 F.3d 590, 609 (5th Cir. 2014).

[41] *Id.* (quoting *United States v. Rose*, 449 F.3d 627, 633 (5th Cir. 2006)).

commission of the offense," (3) "the recruitment of accomplices," (4) "the claimed right to a larger share of the fruits of the crime," (5) "the degree of participation in planning or organizing the offense," (6) "the nature and scope of the illegal activity," and (7) "the degree of control and authority exercised over others."[42]

At sentencing, the district court first considered whether the factors supported a four-level "organizer or leader" increase. After engaging in lengthy discussions with counsel, the court concluded that Warren was not an "organizer or leader" because he did not exercise decision-making authority, did not recruit accomplices, did not exercise a degree of control and authority over others, and did not claim a larger share of the criminal proceeds. The court then considered whether Warren was a "manager or supervisor." In doing so, the district court eschewed the enumerated factors, reasoning that they only informed how to distinguish leadership and organizational roles from managerial or supervisory roles. Instead, the court based its conclusion that Warren was a "manager or supervisor" on the "totality of the circumstances."

Warren argues in passing that the district court should have applied the factors to the manager or supervisor inquiry. But he provides no authority showing that the factors are dispositive or exhaustive, or that going beyond the enumerated factors to consider the totality of the circumstances is error. We decline Warren's request to cabin the district court's discretion in determining which facts are relevant for purposes of sentencing.

Even so, the district court's conclusions that Warren did not exercise decision-making authority, did not recruit accomplices, did not exercise a degree of control and authority over others, and did not claim a larger share

---

[42] § 3B1.1 cmt.4.

of the criminal proceeds seem to be inconsistent with the conclusion that he was a manager or supervisor. Indeed, at sentencing the Government more or less conceded that Warren did not manage or supervise other participants in the conspiracy:

> THE COURT: All right. How much control did Mr. Warren exercise over others, either co-conspirators or unindicted co-conspirators?
>
> MS. HEATH: From what we — we heard only a minimal amount of testimony during trial about that, and that was more on how do you use the system that he put in place and how do you use the database that he put in place and instructing others on how to use it, because a lot of the individuals that were using the system initially did not know how to use the system, so he had to provide training for them to use the system.
>
> So there is direction being given and training being given in order for them to use the system properly. So it's not necessarily control, but it is some direction on how to operate.

And the trial testimony from Mendez and Chilson established that Warren functioned as a consultant to the telemarketing operations, rather than as a manager. All this would seem to preclude the manager or supervisor adjustment under Application Note 2, which provides that "[t]o qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor *of one or more other participants*."[43]

Despite Application Note 2's clear instructions, we have upheld offense-level increases under § 3B1.1 based solely on management of

---

[43] § 3B1.1 cmt.2 (emphasis added).

property, assets or activities.[44] Though we believe those cases incorrectly applied the Guidelines,[45] we are bound by them under our court's rule of orderliness.[46] And here, the record shows that Warren controlled the telemarketing operations' technology, including their database, phone systems, and internet. He created the database that tracked the fraudulent companies' various names and the timeshare owners who were being defrauded. He installed the phones and programmed them to divert calls from timeshare owners to certain telemarketers. He also made sure that outgoing phone calls appeared to come from the companies' fake addresses. Finally, Warren managed the internet service, including the email system and domain names for the fraudulent companies. In light of these facts and our caselaw applying § 3B1.1. for management of property, it was not clear error to find that Warren was a "manager or supervisor."

E

Finally, Martinez contends that the district court's restitution order violated his Sixth Amendment right to a jury trial, but he concedes that this

---

[44] *United States v. Ochoa-Gomez*, 777 F.3d 278, 283 (5th Cir. 2015); *United States v. St. Junius*, 739 F.3d 193, 208–09 (5th Cir. 2013); *United States v. Delgado*, 672 F.3d 320, 345 (5th Cir. 2012) (en banc) ("The application notes to section 3B1.1 require that the defendant either (1) exercised control over another participant in the offense, or (2) 'exercised management responsibility over the property, assets, or activities of a criminal organization.'" (quoting § 3B1.1 cmt.1)).

[45] *See Ochoa-Gomez*, 777 F.3d at 284–86 (Prado, J., concurring) ("*Delgado* appears to have conflated an 'adjustment' and an 'upward departure' for purposes of Application Note 2 to United States Sentencing Guidelines (U.S.S.G.) § 3B1.1. *See* 672 F.3d at 344–45. This issue merits en banc review.").

[46] *United States v. Traxler*, 764 F.3d 486, 489 (5th Cir. 2014).

No. 19-10805

argument is foreclosed by Circuit precedent.[47] He seeks only to preserve the issue for en banc or Supreme Court review.

IV

Warren's and Martinez's convictions and sentences are AFFIRMED.

---

[47] *See United States v. Read*, 710 F.3d 219, 231 (5th Cir. 2012).