# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
February 6, 2023

Lyle W. Cayce
Clerk

No. 21-40366

UNITED STATES OF AMERICA,

*Plaintiff—Appellee*,

*versus*

JAMES MORRIS BALAGIA,

*Defendant—Appellant*.

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 4:16-CR-176

Before ELROD, HAYNES, and WILLETT, *Circuit Judges*.

PER CURIAM:*

A jury found James Morris Balagia guilty of five crimes related to his legal representation of various drug traffickers. Through appointed counsel on appeal, Balagia challenged: (1) the sufficiency of the evidence for four convictions; (2) the propriety of a jury instruction on willful ignorance; and (3) the length of his sentence. Balagia then moved to terminate his counsel, and his counsel withdrew. Proceeding *pro se*, he raised thirteen issues on

---

* This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

No. 21-40366

appeal.  For the reasons set forth below, we AFFIRM Balagia's convictions and accompanying sentences.[1]

## I

Balagia worked as a police officer for ten years before obtaining his law degree and opening a criminal defense practice.  Balagia promoted himself as the "DWI Dude" and mostly represented clients charged with drunk driving or marijuana possession.  However, he also handled some federal cases involving drugs, money laundering, or both.  The facts relevant for this appeal arise out of Balagia's involvement in two separate matters: (A) the McKeown case and (B) the Colombian drug-trafficking cases.

## A

Jill McKeown was arrested for traveling interstate to buy large quantities of marijuana.  The Drug Enforcement Agency seized $50,000 in cash that she planned on using for the transaction.  McKeown then retained Balagia as her criminal defense attorney.  Balagia told McKeown that "he knew judges," "he knew prosecutors," and "it wasn't a problem" to get her charges dismissed.  McKeown was surprised to hear a lawyer make such a claim.

Balagia's insinuations about his supposed ability to get McKeown's charges dropped ended up being unneeded, as she was placed on a pretrial diversion program.  But she also wanted to seek return of the $50,000 in seized funds.  Balagia helped her prepare an affidavit wherein she stated that

---

[1] The factual summaries below are written with all reasonable inferences fairly raised by the evidence drawn in the light most favorable to the verdict. *United States v. Frye*, 489 F.3d 201, 207 (5th Cir. 2007).  For this reason, phrases such as "Person testified that [assertion]" or "the evidence suggests that [assertion]" are omitted from the factual recitation.

she was merely an "innocent owner" of the money and that her possession of it was "not in violation of the law." Balagia would later admit to the State Bar of Texas that he had reason to know these sworn statements were false.

Based on the statements in McKeown's affidavit, the DEA told Balagia it would return the funds. But instead of providing the DEA with McKeown's banking information, he supplied his own law office's account numbers. He claimed this was to recoup unpaid legal fees. That was a lie. McKeown had already paid all fees owed. And rather than sharing the news of the DEA's agreement with McKeown, Balagia sent her a letter through an intermediary asking, "[I]f we could at least get you back 9,000 or $10,000, would you be happy with that?" Not knowing she was being swindled, McKeown agreed. Balagia then received the $50,000 by wire and subsequently transferred $9,500 to McKeown's intermediary.[2]

## B

Balagia's indictment also stems from activity he engaged in related to representing certain Colombian drug traffickers in a drug-importation case. In sum, Balagia accepted drug money from cocaine producers and distributors on the pretense that he and his team would bribe American law-enforcement and/or judicial officials to get their criminal charges dismissed.[3]

The three primary traffickers involved are Ordonez, Segundo, and Aldemar.[4] Segundo and Aldemar are brothers who controlled a Colombian

---

[2] He later returned another $7,000 or $7,500, but only "after the State Bar intervened." .

[3] The complete details are lengthy and complex, spanning over twenty pages of the United States' principal brief. The factual recitation here has been edited for clarity and brevity.

[4] The traffickers' full names are Hermes Alirio Casanova Ordonez, also known as "Megatron"; Segundo Villota-Segura; and Aldemar Villota-Segura.

cocaine lab that could produce 2,000 kilograms of cocaine each week (2,000 kilograms could be worth up to tens of millions of dollars). Before the prosecution began, Segundo and Aldemar's cocaine lab was, by some estimates, the largest in the world. Ordonez also produced cocaine in Colombia. All three traffickers were high-priority targets of United States law enforcement.

Those three men were among a group of other individuals who were indicted by a grand jury in Texas for offenses related to their importing of cocaine into the United States. Following that indictment, the Treasury Department's Office of Foreign Assets Control designated Ordonez, Segundo, and Aldemar as significant foreign narcotics traffickers under the Foreign Narcotics Kingpin Designation Act, 21 U.S.C. § 1901 *et seq.* For an attorney in the United States to accept payments from an OFAC-designated person, the lawyer must get a case-specific license.[5] *See* 21 U.S.C. § 1904(c) ("Prohibited transactions").

1

The relevant facts begin with Balagia's representation of Ordonez and Segundo. A Colombian attorney introduced Ordonez and Segundo to Balagia. In agreeing to represent Ordonez and Segundo, Balagia promised to bribe federal officials to drop the charges. Balagia charged Ordonez $700,000 for this, and he charged Segundo $900,000. Balagia and the Colombian attorney agreed to split the fees between themselves and several others that were assisting.

---

[5] However, such a license is not difficult to procure. A lawyer can apply through OFAC's website, and OFAC almost always grants the request.

No. 21-40366

Using structured deposits of amounts all below $10,000 (and spread across various states), Balagia began depositing funds received from Ordonez and Segundo.  By the time he had deposited at least $172,000, Balagia was explicitly informed by an Assistant United States Attorney that Ordonez and Segundo had been identified by OFAC and that Balagia would need a license to accept payments from them.  Balagia ignored this information and continued his representation without a license.  Sometime after that warning, Balagia and his assistants picked up cash in parking lots in Houston from carriers that were moving the money in paper bags.  The paper-bag cash deliveries led to Balagia making bank-account deposits in the amounts of $78,000; $84,000; and $42,300.

At this point, Ordonez was arrested in Colombia by Colombian law enforcement.  Balagia met with him and assured Ordonez not to worry because Balagia could still get the U.S. charges dropped.  Instead, Balagia tricked Ordonez—a Spanish-language speaker—into signing a plea agreement written in English.  Balagia then met with the same AUSA who provided him with the OFAC warning and presented the AUSA with the agreement.  This struck the AUSA as "really odd" because Ordonez had not been extradited, which is when plea discussions usually begin.

At the same meeting, Balagia told the AUSA that Segundo wanted to cooperate too.  The AUSA noted that timely cooperation would be helpful.  However, Balagia's promised cooperation never materialized, as Balagia always canceled the scheduled meetings shortly before they were to occur.

After months of failing to cooperate, Segundo was also arrested in Colombia.  Balagia and his assistants went to Colombia to meet with him.  Segundo expressed concerns that Balagia's promises to bribe federal officials were not showing any results.  One of Balagia's associates said that thanks to

the money Segundo had provided, he "was able to pay four people . . . in Washington, D.C." This was a lie. No bribery payments had been made.

However, Balagia continued his charade of carrying through his bribery promises. At the meeting, Balagia explained how the payments were allegedly going on. Balagia's non-lawyer associate was the "meat in the sandwich" between Balagia and Segundo. Balagia told Segundo that using a non-lawyer associate as an intermediary would allow him to "stay very, very clean" as the payments were occurring. Balagia said, "it gives me the ability to close my ears sometimes, if I need to, and it protects all of us." Balagia then left the room so that his non-lawyer associate could talk with Segundo and Balagia could "pretend to be deaf with some things," like bribery proposals.

At that same meeting, Balagia or his associates told Segundo that he should provide 30 or so names to the DEA. However, the names were not to be real leads on identifying who was leading the cocaine operations in Colombia. They were to be people "already under investigation" or "picking out names just to pick them" so that Segundo could give the appearance of cooperating while gumming up the DEA's investigation.

Ordonez was then extradited to the United States. Balagia hounded Ordonez for payment, saying that "the prosecutor has to see a fat wallet. If not, I can't work it." Ordonez seemed to realize that Balagia was not going to be able to get the charges removed, so he pleaded guilty. Balagia continued to say that he needed more money to help Ordonez get a lighter sentence. He told Ordonez, "We have a saying up here. Money talks. You know the rest of it?" Balagia also said that he could not obtain results for Ordonez until he was paid in full.

No. 21-40366

2

The second part of the relevant facts relates to Balagia's attempt to represent Aldemar, Segundo's brother. Following all the above events with Ordonez and Segundo, Aldemar made his initial appearance in the importation case. At that point, Balagia sought to recruit him as a client. Aldemar knew who Balagia was because Segundo had relayed the way that representation was going. Aldemar was not pleased with Balagia's treatment of his brother. Aldemar told the government that he would pretend to be interested in Balagia's services so he could record conversations with Balagia and his team.

Aldemar and an undercover agent (posing as an accountant for the cocaine operation) then met with Balagia and two of Balagia's associates. Aldemar recorded the conversations that occurred therein. The undercover agent asked Balagia if it was okay that all money Aldemar would use to pay him would be drug money. Balagia replied, "I have paperwork I have to fill out. That's on me." The undercover agent also stated that Balagia was "able to pay some people in Washington" on behalf of Segundo, which Balagia did not deny. And one of Balagia's associates said that he "might have been generous with some things, but — maybe an extra scoop of ice cream on a sundae."[6]

Following that meeting, the undercover agent followed Balagia and his associates outside and said, "[Y]ou understand what [Aldemar] was looking for, right? . . . [H]is understanding was basically like this money was given to the right people to get him off the charge. And that's what he was looking for." Balagia replied by saying it was nice to meet Aldemar and his accountant. Balagia then left, but one of Balagia's associates stayed to

---

[6] Filler words have been removed from this quotation.

continue talking to the undercover officer. In that further discussion, Balagia's associate told the undercover officer, "I don't have a problem with one word that you said."

Balagia agreed to represent Aldemar for $1.2 million. The undercover agent who had been in the initial meeting agreed to meet one of Balagia's associates and make a $300,000 down payment. The undercover agent gave Balagia's associate a bag with $300,000 in cash. The associate took the bag, walked away, and was arrested. In his possession was a signed affidavit from Balagia wherein Balagia averred that Aldemar had hired him and that Balagia's firm employed the associate who had just been arrested for taking payment from the undercover agent.

## II

Based on the actions described above, a jury convicted Balagia of five crimes: Money-laundering conspiracy, 18 U.S.C. § 1956(h) (Count One); obstruction of justice, 18 U.S.C. § 1503 (Count Two); willful violation of the Kingpin Act, 21 U.S.C. §§ 1904(c) and 1906(a) (Count Three); wire-fraud conspiracy, 18 U.S.C. § 1349 (Count Four); and conspiracy to obstruct justice, 18 U.S.C. § 371 (Count Five). The district court sentenced Balagia to 188 months in prison, a special assessment of $500, and supervised release for a term of 3 years.

In Balagia's first two briefs on appeal, which were submitted by appointed counsel, Balagia raised the following issues:

1. Whether the evidence was sufficient to sustain his convictions for Counts 2, 3, 4, and 5.
2. Whether the district court reversibly erred in giving a willful blindness instruction.
3. Whether the district court imposed an unreasonable sentence.

No. 21-40366

We then granted Balagia's motion to proceed *pro se*. He filed a second supplemental brief that raised 13 claims for relief, 11 of which bore no relation to the claims presented by his attorneys. Those issues, consolidated where possible, are as follows:

1. Whether the district court violated Balagia's qualified right to counsel of choice. (Issues 1 and 2).
2. Whether the district court abused its discretion in denying trial counsel's motions to continue. (Issues 3 and 5).
3. Whether the district court abused its discretion in declining to strike Agent Rennie's testimony after he said that he was not an expert. (Issue 4).
4. Whether the district court limited the impeachment of Anthony Felsing and, if so, whether it plainly erred. (Issue 6).
5. Whether the district court abused its discretion in its handling of alleged "jury misconduct." (Issues 7 and 8).
6. Whether the district court correctly calculated Balagia's advisory Guidelines range. (Issues 11 and 12).
7. Whether Balagia's prison term, which was nearly four years below the advisory range, was unreasonably severe. (Issue 13).
8. Whether Balagia shows any error in the forfeiture of his house and office. (Issues 9 and 10).

A

We first address the issues raised by Balagia through counsel.

1

Balagia argues that the record lacks sufficient evidence to sustain his convictions for obstructing justice, willfully violating the Kingpin Act, wire-

fraud conspiracy, and conspiracy to obstruct justice (Counts 2, 3, 4, and 5). Because Balagia fails to meet the high bar of showing that *no* rational jury could have found guilt beyond a reasonable doubt, we affirm. *United States v. Beacham*, 774 F.3d 267, 272 (5th Cir. 2014).

a

The convictions for obstructing justice and conspiring to obstruct justice are supported by similar evidence. On the substantive Count, the government was required to prove: "(1) that a judicial proceeding was pending; (2) that [Balagia] had knowledge of the judicial proceeding; and (3) that [Balagia] acted corruptly with the specific intent to influence, obstruct, or impede that judicial proceeding in its due administration of justice." *United States v . Richardson*, 676 F.3d 491, 502 (5th Cir. 2012); 18 U.S.C. § 1503(a). The associated conspiracy claim requires a showing that Balagia joined an agreement between two or more people to pursue that unlawful objective and that Balagia possessed "the same degree of criminal intent as is necessary for proof of the underlying substantive offense." *United States v. Fisch*, 851 F.3d 402, 407 (5th Cir. 2017) (quoting *United States v. Peterson*, 244 F.3d 385, 389 (5th Cir. 2001)).

The evidence recounted above shows that a reasonable jury could have found all those elements to have been proved beyond a reasonable doubt. Balagia knew that the United States had indicted 17 defendants, including Ordonez, Segundo, and Aldemar. Balagia's promises to his clients to bribe federal officials ensured that those clients would not cooperate with the governmental investigation (as they previously had done) because, as the jury could infer, the clients would believe they were immune from normal prosecution and had no reason to cooperate. Not only did Balagia act corruptly by promising to bribe federal officials and defrauding his clients, he also devised a plan to affirmatively mislead the government by having

Segundo provide red-herring names to the DEA. All along the way, Balagia made agreements with his clients, his associates, and the Colombian attorney to further these unlawful objectives.

b

A reasonable jury could have delivered a guilty verdict for conspiracy to commit wire fraud. To prove that offense, the government had to show that "(1) two or more persons made an agreement to commit wire fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, *i.e.*, with specific intent." *United States v. Kuhrt*, 788 F.3d 403, 414 (5th Cir. 2015). Here, Balagia conspired with at least one or more of his associates and the Colombian attorney to defraud all four of McKeown, Ordonez, Segundo, and Aldemar.

Balagia's handling of the partial return of McKeown's seized funds is, itself, enough to sustain a conviction on this Count. In that matter, Balagia and his associate received all $50,000 of McKeown's funds from the DEA but misrepresented that information to McKeown and her representatives so that Balagia could fraudulently retain most of that money.

Balagia's involvement in the Colombian drug trafficking case also gave rise to enough evidence to sustain his wire fraud conviction. The basis of that representation, for all three Colombian drug traffickers, was that Balagia would work with others to bribe federal officials and get the charges dropped. The lawyers and their teams would transmit messages over phone and receive money payments to be electronically deposited or transferred into their bank accounts. This is supported by audio recording, multiple witnesses' testimony, and Balagia's own admission that he was present for discussions with the defendants about paying people off (though Balagia claimed to have been "shocked" to hear that brought up during those meetings). Because the evidence shows that Balagia did not actually bribe

officials (which would have given rise to other forms of criminal liability), the evidence supports a conviction for conspiracy to defraud his clients on the basis of the false promise to engage in such bribery.

c

Evidence also supports Balagia's conviction for violating the Kingpin Act. That law prevents any United States person, including attorneys, from dealing with individuals identified by OFAC without obtaining the proper license. 21 U.S.C. § 1906(a)(1). The Act provides criminal penalties for failing to comply with that requirement. At no time did Balagia obtain or even seek a license to represent his OFAC-designated clients. The only question is whether this failure was willful. The jury had good reason to find it was.

The district court instructed the jury that for this purpose, to "willfully" violate the act means "voluntarily and purposely, with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or disregard the law." The evidence reveals that Balagia either knew that his clients were designated by OFAC or Balagia willfully avoided knowing that. First, Balagia was an experienced criminal defense attorney. Second, he received multiple notices from an AUSA that his clients were designated by OFAC and required additional paperwork to be represented. Third, even a cursory Google search of Balagia's clients' names reveals near the top of the search results that they have been designated as drug traffickers by OFAC. As the government argues, that is "willfulness on stilts."

2

Balagia also contends that the district court erred in instructing the jury on "deliberate ignorance." We review the district court's decision to do so for abuse of discretion. *Fisch*, 851 F.3d at 411. While it is true that the circumstances properly giving rise to such an instruction are "rare," *United*

*States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990), this is one such case where it was appropriate.

A district court may provide a deliberate-ignorance instruction when the evidence at trial raises two inferences: "(1) the defendant was subjectively aware of a high probability of the existence of the illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct." *Id.* (quoting *United States v. Alvarado*, 838 F.2d 311, 314 (9th Cir. 1987)). Both inferences are raised here.

First, Balagia was subjectively aware of a high probability of illegal conduct. As he admitted at trial, he heard his associate telling Segundo that he had paid off four officials in Washington, D.C. And even though the bribes did not actually happen, Balagia's hearing that comment would have put him on alert that it was highly likely something unlawful was occurring. *See United States v. Araiza-Jacobo*, 917 F.3d 360, 366 (5th Cir. 2019) (noting that subjective awareness "often overlaps with" actual knowledge).

Second, Balagia took steps to avoid gaining knowledge of what was really occurring in his representation of the Colombian drug traffickers. Balagia's associate told Segundo, in Balagia's presence, that the team's tactics would be "messy," that Balagia had to stay "clean." Balagia's associate said he would be the "meat in the sandwich" between Segundo and Balagia. As Balagia himself then told Segundo, running the representation this way would "give[] me the ability to close my ears sometimes." The government correctly argues that "[c]onsciously closing one's ears is the definition of deliberate ignorance."

Because the evidence gives rise to both necessary inferences, the district court was within its discretion to instruct the jury on deliberate ignorance.

No. 21-40366

3

Balagia's final argument raised through counsel is that the district court "sentenced Balagia based upon an improperly calculated advisory Guidelines range that should have been multiple offense levels lower." Because the district court did not commit clear error, we affirm.

Using the 2018 Sentencing Guidelines, the probation office prepared a presentence report that calculated an offense level of 38, a criminal history category of I, and an imprisonment range of 235 to 293 months. The PSR also recommended a four-level leadership enhancement under U.S.S.G. § 3B1.1(a) and a two-level abuse-of-trust enhancement under U.S.S.G. § 3B1.3. The district court adopted the PSR's calculations but varied downward from the applicable range because of Balagia's age, lack of criminal history, good works, and family ties. The district court also wanted to avoid disparity between Balagia's sentence and the sentence of one of Balagia's associates, who did not receive a leadership enhancement but possibly should have. Without the four-level leadership enhancement, the Guidelines range was 151 to 188 months. The court imposed a term of 188 months.

Balagia makes three challenges to the district court's calculations. He disputes the sum of laundered funds, argues against the leadership enhancement, and rejects the abuse-of-trust enhancement. We review each of the district court's findings for clear error. *United States v. Tansley*, 986 F.2d 880, 884 (5th Cir. 1993) (value of laundered funds); *United States v. Alaniz*, 726 F.3d 586, 622 (5th Cir. 2013) (leadership); *United States v. Miller*, 607 F.3d 144, 147–48 (5th Cir. 2010) (abuse of trust). "A factual finding is not clearly erroneous if it is plausible in light of the record as a whole." *Alaniz*, 726 F.3d at 618 (quoting *United States v. Johnston,* 127 F.3d 380, 403 (5th Cir. 1997)).

First, the district court did not clearly err in determining the amount of funds laundered. Balagia's team charged or attempted to charge Ordonez, Segundo, and Aldemar a total of $700,000; $1,500,000; and $300,000 for the "legal services" provided. Based on these numbers, the PSR calculated a total value of funds intended to be laundered at $2.5 million. This total number, which came from Balagia's team's own proposed fees, is a "reasonable estimate." *Alaniz*, 726 F.3d at 623 (quoting commentary to Section 2B1.1). And adopting this method for calculating the sum of funds intended to be laundered fits within the district court's "broad discretion" in "determining value." *United States v. Tencer*, 107 F.3d 1120, 1137 (5th Cir. 1997).

Even if Balagia could dispute that he is singularly responsible for that sum of money intended to be laundered, it is important that Balagia was convicted of *conspiracy* to launder funds. In a conspiracy case, a district court can include in its calculations the actions of a coconspirator that were reasonably foreseeable and that were within the scope of the conspiracy. U.S.S.G. § 1B1.3(a). And for conspiracy prosecutions and sentencing, even the "intention of laundering the entire amount is enough for sentencing purposes." *Tansley*, 986 F.2d at 884. Regardless of whether the conspirators were adept enough at defrauding their clients to obtain the full amount sought, they still *conspired* to procure that amount of money. The conspiracy itself is a crime.

Second, the district court did not err in its leadership-enhancement calculations. Section 3B1.1 prescribes a four-level enhancement if "the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). Balagia's conspiracy involved more than five people. And he was undoubtedly a leader in the agreement. Taking the evidence in the light most favorable to the verdict, Balagia was the leader of a firm that was involved in

an organized attempt to defraud criminal defendants and accept their unlawfully obtained funds in contravention of the Kingpin Act. The law firm was Balagia's, and the employees followed Balagia's direction.

The commentary lists several factors bearing on the leadership-enhancement inquiry: "exercise of decision making authority"; "nature of participation"; "recruitment of accomplices"; "the claimed right to a larger share of" proceeds; "degree of participation in planning or organizing"; "nature and scope of the illegal activity"; and "degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. (n.4). We look at these factors as a whole. *United States v. Warren*, 986 F.3d 557, 568 (5th Cir. 2021). On balance, the evidence supports the district court's identification of Balagia as a leader in the crime for sentencing-enhancement purposes.

Third, the district court did not err in applying an abuse-of-trust enhancement. Section 3B1.3 prescribes a two-level enhancement if "the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." An abuse-of-trust enhancement is warranted if the defendant (1) "occupied a position of trust," and (2) used it "to significantly facilitate the commission or concealment of the offense." *United States v. Ollison*, 555 F.3d 152, 165 (5th Cir. 2009).

We have routinely held that attorneys occupy a position of trust, so the first requirement is satisfied. *See, e.g.*, *United States v. Harrington*, 114 F.3d 517, 519 (5th Cir. 1997). "The integrity of our judicial system inextricably is intertwined with the integrity of our trial lawyers. Consequently, it cannot be gainsaid that lawyers occupy a position of public trust." *Id.*

The second requirement is satisfied too. Balagia used his position as an attorney to significantly facilitate the commission of his offense because

the very premise of Balagia's operation was that Balagia would recruit McKeown and the Colombian drug traffickers as clients in his capacity as a lawyer. *Cf.* U.S.S.G. § 3B1.3 cmt. (n.1) ("This adjustment . . . applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination.").

Here are just two examples of culpable actions Balagia undertook while purporting to act as his client's faithful attorney. Balagia accepted the DEA's repayment of McKeown's seized funds and fraudulently withheld a portion from her. And as counsel for Ordonez and Segundo, Balagia accepted client payments made on false assurances of dismissal while pocketing their funds instead. The facts recounted above provide numerous additional examples that the district court could have relied on in determining that Balagia abused his position of trust to significantly facilitate his criminal behavior. As such, the district court committed no clear error in its calculations.

B

After moving to withdraw his second court-appointed counsel, Balagia raised a litany of additional, difficult-to-construe issues in his *pro se* supplemental brief. Normally, we apply a liberal standard in construing the arguments briefed by defendants who elect to proceed *pro se* in a direct criminal appeal. *United States v. Diehl*, 775 F.3d 714, 719 (5th Cir. 2015). That duty flows from the principle that a litigant should "not suffer simply because he did not attend law school or find a suitable attorney." *Id.* (citation

omitted).  Here, however, the *pro se* defendant did in fact go to law school.[7] We therefore do not accord his briefing the advantage of liberal construction. *Olivares v. Martin*, 555 F.2d 1192, 1194 n.1 (5th Cir. 1977).

Normally, we consider an appellant to have abandoned "all issues not raised and argued in its *initial* brief on appeal." *Cousin v. Trans Union Corp.*, 246 F.3d 359, 373 n.22 (5th Cir. 2001) (citation omitted).  We retain discretion to consider any arguments Appellant raises after that point.  *Id.* While we do not consider as waived the 11 additional issues Appellant raises in his third supplemental brief (submitted *pro se*), we do not accord them the liberal construction typically provided to *pro se* litigants.  Because none have merit, we dispose quickly of each argument below.

### 1 & 2

In Balagia's first and second issues for review, he argues that the district court violated his Sixth Amendment right to counsel by preventing him from using his counsel of choice.  As Balagia admits, his first-preferred counsel was disqualified after being suspended from practice in the Eastern District of Texas for disciplinary reasons.  Balagia's second-preferred counsel could not represent Balagia because she had breast cancer.  She moved to withdraw her representation after the trial had already been continued for months to accommodate her medical condition.  The court then appointed another counsel (who joined a second counsel who had previously been appointed co-counsel to Balagia's second-preferred lawyer).

We review for abuse of discretion the district court's decision to disqualify Balagia's first counsel and the district court's denial of an

---

[7] Not only that, but he testified that his LSAT score was "in the top one and a half percent of the nation" and that his attendance at the University of Texas School of Law was funded by a "full scholarship for academics."

additional medical-related continuance for Balagia's second-preferred counsel. *United States v. Dinitz*, 538 F.2d 1214, 1219–20 & n.7 (5th Cir. 1976) (*en banc*) (disqualification); *United States v. Hughey*, 147 F.3d 423, 431 (5th Cir. 1998) (denial of continuance). Although criminal defendants do have a "qualified right to retain counsel of the defendant's own choosing," this right is not limitless. *Hughey*, 147 F.3d at 428. The district court did not abuse its discretion in managing the trial as it did, which resulted in Balagia's having two separately appointed, competent co-counsel.

3

Balagia's third issue for review is whether the district court erred in denying Balagia's additional motions for continuance because that made Balagia "not ready for trial." "We review the denial of a motion for continuance for abuse of discretion." *United States v. Barnett*, 197 F.3d 138, 144 (5th Cir. 1999). Balagia's single-paragraph argument on this point does not identify the required "'specific and compelling' or 'serious' prejudice" needed to secure reversal. *Id.* (quoting *United States v. Krout*, 66 F.3d 1420, 1436 (5th Cir. 1995).

4

Balagia's fourth issue for review objects to the district court's refusal to strike certain expert testimony. "We can overturn the ruling only if it was 'manifestly erroneous.'" *United States v. Lee*, 966 F.3d 310, 322 (5th Cir, 2020) (quoting *Kuhrt*, 788 F.3d at 418). "Even then, as is true for other evidentiary issues, the government can salvage the convictions by proving any error was harmless." *Id.*

The testimony in question was from an FBI Agent who spoke about money laundering. The witness stated he was familiar with "money laundering techniques and transmission of currency including structuring techniques." At some later point, the Agent said on the stand that he was

not an expert on whether a hypothetical fact scenario would violate statutes criminalizing money laundering.  A witness's disclaiming of expertise in one area does not prevent the district court judge from identifying the witness as an expert with regard to other testimony under *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).  Thus, the district court did not err in making its own independent determination of the witness's qualifications.  And any error was harmless, as the record contains voluminous transcripts of testimony on which a reasonable jury could have reached the same result.

5

Balagia's fifth issue for review argues that the district court's denial of his motion for continuance violated his Sixth Amendment right to adequate counsel because it left 19 days for trial preparation.  This argument fails.  *See United States v. Lewis*, 476 F.3d 369, 387 (5th Cir. 2007) (10 days between appointment and trial).

6

Balagia's sixth issue is that the trial court wrongfully prevented him from impeaching a witness.  This issue is unreviewable as Balagia made no objection at trial and there is no written record of any decision by the district court to limit impeachment.  *Parliament Ins. Co. v. Hanson*, 676 F.2d 1069, 1074 (5th Cir. 1982).

7

Balagia's seventh issue asserts that the district court erred in denying a mistrial after a man was removed from the audience for allegedly making threatening motions at the jury.  Balagia argues both that the district court's removing of the man and the court's subsequent increase in security tainted the trial:

> This created a visual and psychological appearance that there was a distinct barrier in the courtroom with the jury, prosecution table and prosecution audience/spectators side of the courtroom and a separate side consisting of the defense table and defense spectators/family/friends/supporters. There was a good side and a bad side for the jury to pick from and you can guess which side I was sitting on.

Balagia's argument as to the removal being improper fails because at trial he consented to the removal. And his argument about the prejudice of creating a "good side" and "bad side" fails to specifically identify any specific harm suffered. The adversarial nature of courtroom proceedings is a feature, not a bug, of criminal prosecution. *See Jones v. Davis,* 890 F.3d 559, 571 (5th Cir. 2018).

8

Balagia's eighth issue for review asserts that the district court also erred in not granting a mistrial based on allegedly disruptive activity during trial. The second disruption (after the first disruption caused by the threatening motions) was an anonymous caller who claimed to be the husband of a juror. The caller said that the jurors feared if they did not convict Balagia, they would face retribution from the Colombian drug traffickers. The district court determined that the caller was an uninvolved outsider attempting to assist Balagia by creating circumstances that would lead to a mistrial.

We review the district court's decision for abuse of discretion. *United States v. Kelley*, 140 F.3d 596, 608. Because Balagia does not show that the district court failed to address "a colorable showing that an extrinsic influence was actually made on the jury," the district court committed no error, reversible or otherwise. *Id.*

No. 21-40366

## 9 & 10

Balagia's ninth and tenth issues for review relate to an interlocutory motion for sale of his house and office.  First, he says his appointed counsel who handled the motion was not qualified.  He cites no law in support of this complaint.  Nor is it clear what law he could cite.  The issue is not presented as an ineffective assistance of counsel claim, and no alternative theory of relief is provided either. *See United States v. Isgar*, 739 F.3d 829, 841 (5th Cir. 2014).  Accordingly, this claim fails.

Second, Balagia argues that the court erred in allowing the forfeiture of his office building because the value of unlawful, commingled funds could not justify sale of the entire building.  Again, he cites no law under which such a complaint is legally cognizable.

## 11 & 12

Balagia's eleventh and twelfth issues restate the arguments previously made by Balagia's counsel that the district court erred in calculating his sentences.  For the reasons discussed previously, this argument fails.  *See supra* Section II.A.3.

## 13

Balagia's thirteenth, and final, issue for review is that the district court erred in making Balagia's sentence excessively severe.  Balagia points to 18 U.S.C. § 3553, but he cites no cases nor makes any explanation in law as to how the sentence was unreasonably severe.  He notes that he "has missed his son's wedding, his son's swearing in as a member of the State Bar of Texas as a licensed attorney, and the graduation ceremony from the University of Texas School of Law."  These are the normal incidents of being incarcerated.  They do not show that his sentence was unlawfully severe.

No. 21-40366

Balagia also argues that it was unusually severe to force him to forfeit certain property related to his crimes. Whether Balagia's property was forfeitable was a fact question presented to the jury. The jury decided that Balagia's office had the "required connection" to his offenses but that his house did not. However, Balagia was also required to forfeit $1.5 million in cash proceeds. When that sum could not be located, the district court ordered Balagia to forfeit his house as a substitute asset. The district court held a hearing on Balagia's motion to reconsider the preliminary order of forfeiture and the government's motion for interlocutory sale. The defense said that Balagia no longer had any interest in either property. The court asked the defense for confirmation that "you're agreeing to the interlocutory sale" of the house and office. Defense counsel said yes. The court then entered an order authorizing interlocutory sale of both properties. There is no error to reverse.

\* \* \*

Having reviewed all issues raised by Balagia's multiple counsel and then later in his *pro se* brief, we find no reversible error in any part of Balagia's convictions or related sentences. As such, we AFFIRM.